**UNITED STATES of America**

v.

**Charles McNEIL, Appellant.**

**No. 24263.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 18, 1970.

Decided Aug. 28, 1970.

Mrs. Barbara Allen Bowman, Washington, D. C., for appellant.

Mr. John A. Terry, Asst. U. S. Atty., with whom Mr. Thomas A. Flannery, U. S. Atty., was on the response to the motion, for appellee. Mr. Edwin A. Williams, Asst. U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, and MacKINNON and ROBB, Circuit Judges.

PER CURIAM:

The District Court, after hearing, denied Saint Elizabeths Hospital's application to grant appellant a conditional release in an unexplicated order. The case is before us on appellant's motion for summary reversal.

■ It is elementary in this jurisdiction that, in order to provide a framework adequate for appellate review, decisions such as the one before us must be accompanied by findings of facts and conclusions of law. *See* Tatem v. United States, 107 U.S.App.D.C. 230, 232, 275 F.2d 894, 896 (1960); Hough v. United States, 106 U.S.App.D.C. 192, 195–196, 271 F.2d 458, 461–462 (1959). Moreover, it appeared upon oral argument that the court below did not have before it all of the evidence which the parties, at the present time at least, consider relevant to its decision.

■■ We do not believe this case is an apt one for summary reversal;[1] but neither do we believe that the present state of record is adequate to permit appellate review under the proper standards. Accordingly, we deny appellant's motion for summary reversal, but vacate the judgment below and remand the case to the District Court for the taking of such additional evidence as the parties may see fit to introduce, and such further proceedings as may be appropriate. At the conclusion of the proceedings on remand, the District Court should file findings of fact and conclusions of law in accordance with the applicable standards. *See* Bolton v. Harris, 130 U.S.

---

1. McNeil was tried for the offense of taking indecent liberties with a minor child and was found not guilty by reason of insanity. He has been at St. Elizabeths Hospital just over two years since his trial and now seeks release on condition that he, an alcoholic, refrain from ingesting alcohol and report daily to a clinic for the administration of antabuse. Antabuse is a drug that causes one to become ill if he drinks alcohol. Evidence at the hearing below was to the effect that if he refrained from drinking alcohol it was "unlikely" that his admitted propensity for such crimes would manifest itself. Whether the public should be subjected to the obvious hazards inherent in a release at large on such conditions is one of the vital questions for the trial court. At the hearing a psychiatrist testified:

THE COURT: Do you have an opinion [as?] to whether he has recovered his sanity?

THE WITNESS: Yes, sir.

THE COURT: And he has recovered it?

THE WITNESS: No, Sir. I think he has improved and partially recovered, I would say.

THE COURT: But he is still of unsound mind?

THE WITNESS: He is still suffering from the same illness?

THE COURT: That he was acquitted on?

THE WITNESS: Yes, sir.

Also, that if he were released:

I don't believe he would be dangerous, if he would adhere to the conditions stipulated.

\* \* \* \* \*

Q What is his diagnosis, by the way, Doctor?

A Unspecified sexual deviation.

\* \* \* \* \*

THE WITNESS: The prognosis for him ever being rid of his diagnosis is poor. The prognosis for not acting antisocially is very good, if he doesn't ingest alcohol.

App.D.C. 1, 395 F.2d 642 (1968); Lake v. Cameron, 124 U.S.App.D.C. 264, 364 F.2d 657 (1966) (*en banc*); Hough v. United States, *supra*. On any remand hearing the opinion of a qualified psychologist is competent and admissible, Jenkins v. United States, 113 U.S.App. D.C. 300, 307 F.2d 637 (1962) (*en banc*). This does not mean that the trier of facts is bound by such opinion. As we stated in *Jenkins*, "The weight to be given any expert opinion admitted in evidence by the judge is exclusively for the jury." 113 U.S.App.D.C. at 309, 307 F.2d at 646. Here the judge was the trier of facts and the same rule applied. His remarks could be interpreted as expressing only his opinion as to the weight of the psychologist's testimony. Since that testimony was admitted into evidence the court obviously recognized in the legal sense that the psychologist was competent to testify.

Vacated and remanded.

BAZELON, Chief Judge (concurring):

I agree that the present record would not justify our summarily ordering appellant's conditional release, and accordingly I join in the opinion of the court insofar as it remands this case to the District Court for the taking of further evidence and for proper findings of fact and conclusions of law. I cannot, however, join in the court's silence regarding the conduct of the hearing below, and the issues that will arise upon remand. In my view, our responsibility for the administration of justice in the courts of this circuit constrains us to address ourselves more fully to these matters. Since the hearing in the District Court lasted only thirty minutes, and since a full understanding of the course of that hearing is important to an understanding of the issues in this case, I have set out below substantial portions of the transcript.

## I.

The appellant here is a 61-year-old man who in March, 1968, was acquitted by reason of insanity of a charge of taking indecent liberties with a minor child. He was immediately committed to Saint Elizabeths Hospital for further examination and, in May of 1968, committed to the hospital for an indefinite period of treatment.[1] Initially confined in John Howard Pavilion, the maximum security unit at the hospital, he was described as a "model patient" and shortly thereafter transferred to a less restrictive service.[2] During intensive therapy there, his condition continued to improve; except for "intermittent episodes of drinking,"[3] he "continued in what was an exemplary behavior pattern." In July of 1969, the hospital first considered recommending him for conditional release. After administering to him a battery of psychological tests, it concluded that release was not warranted at that time. The hospital did, however, transfer appellant to another ward where he participated in a "therapeutic community program and a kind of intense patient therapy group which meets every week day." His "behavior, once again, was exemplary. He did all that was expected. He entered into various therapies, never caused any problems, except for intermittent episodes of alcohol intoxication." Accordingly, appellant was urged by the hospital to accept "antabuse therapy," which consists primarily of taking a drug—antabuse— "which tends to prevent alcohol intoxication by virtue of making the person ill

1. Appellant has in fact resided in Saint Elizabeths continuously since December of 1967, when he was committed to the hospital for an examination of his mental condition following his arrest.

2. Statements regarding appellant's progress are taken from uncontradicted testimony of the clinical psychologist and psychia-

trist from Saint Elizabeths at the hearing below.

3. Dr. Murkofsky, a psychiatrist on the hospital staff, testified at the hearing that alcohol "is widely available at Saint Elizabeths on the grounds. The grounds are, as you know, open to the community."

who takes it while on antabuse." At the time of the hearing, he had been on antabuse for several months.

Early in 1970, "because the decision about whether or not to recommend him for conditional release was very thorny," appellant was "presented to * * * a grand rounds presentation, to the senior staff of forensic services." They concluded that Mr. McNeil's difficulties with the law stemmed from his drinking: "if Mr. McNeil didn't drink, it was unlikely that his antisocial behavior would ever manifest itself." Believing that this problem could be overcome, the hospital began to fashion a plan for his conditional release. Crucial to this plan was a mechanism whereby it could be assured that appellant would continue taking antabuse. Initially, appellant was to remain at the hospital but was to obtain outside employment; during that period, the hospital would "give [antabuse] to him and watch him swallow it." When appellant returned to the community, the hospital would arrange "to have a community based clinic [or] physician administer it to him and watch him take it."

Having devised a plan for appellant's conditional release, the hospital notified the District Court and the United States Attorney. The United States Attorney chose not to oppose release; but after a brief hearing, the District Court denied appellant release on any conditions.[4] On appellant's motion, the court held a second hearing; at the conclusion of this hearing, the District Court once again denied appellant release on any conditions. No findings of fact or conclusions of law were ever filed.

II.

The second hearing before the District Court lasted only thirty minutes.[5] Although brief, it was confused. Appellant produced two witnesses to testify on his behalf. The first was Dr. John J. Maher, a clinical psychologist on the staff of Saint Elizabeths. Dr. Maher had administered a battery of psychological tests to appellant in June of 1969, and again in February of 1970; in addition, he was also familiar with the results of an earlier series of tests administered to appellant by someone else in 1968. It appears that the substance of Dr. Maher's testimony, as he sought to present it, was that his opinion regarding appellant's condition rested primarily upon Rorschach inkblot tests that Dr. Maher had administered. In 1969, appellant had exhibited "a number or rather crass sexual responses" to the blots, chiefly female genitalia. This, perhaps along with other of appellant's responses to the tests administered by Dr. Maher,[6] indicated to the latter that appellant at that time was too much preoccupied "with his own sexual adequacy."[7] When the tests were again administered in 1970, however, these responses were no longer in evidence; although Dr. Maher still found "a type of sexual response on there," he did not consider it inappropriate: it was "a

4. The only witness at this first hearing was Dr. Charles Murkofsky, a psychiatrist from Saint Elizabeths who also testified at the second hearing. Although a court reporter was present, the first hearing does not appear to have been transcribed and no record of these proceedings is presently before us.

5. The transcript of the hearing occupies only twenty-eight double-spaced pages of typescript.

6. *See* Transcript 10–11. Although Dr. Maher began to describe appellant's responses to the other tests he had administered, his testimony was interrupted and he never explained to what, if any, extent his conclusions were based on the other tests.

7. This in itself, of course, is hardly a basis for commitment. Dr. Maher never explained how this preoccupation related to other elements of appellant's mental state, or to what extent it could have been expected to influence his behavior. This lacuna in the testimony may have been due to the fact that, Dr. Maher testified, the preoccupation had disappeared by the time that appellant was tested in 1970, the time at which the hospital recommended him for conditional release.

nurturing kind of response, female breasts, things of this kind."

Dr. Maher's presentation of his testimony, however, was seriously hampered by the trial court's constant intrusions:

The Court: What is the test you gave him, the Rorschach test?

The Witness: It is a standard psychological ink blot test.

The Court: I am very familiar with it.

How does it happen that anybody has sexual feelings in the Rorschach test?

The Witness: The cards themselves are not pictures of anything.

The Court: I know.

The Witness: They are ambiguous—

The Court: I have seen them. I can't figure out what they are either.

\* \* \* \* \* \*

The Court: What are his responses to the Rorschach test?

The Witness: In 1969—no, in 1968, there were four—as I recall, four—responses which were explicitly related to female genitalia.

The Court: What are they? I don't know what they are. What were the responses from the Rorschach test? What were the four?

\* \* \* \* \* \*

The Court: Are you telling me from the cards you showed him in the Rorschach test he said that it was a woman's genitalia?

The Witness: Yes, sir. That was in 1968 and again in 1969.

The Court: Don't you think he is a little mentally sick, then, if he picks out something from a Rorschach test like that? Do you think that is normal? Can you pick out a woman's genitalia in the Rorschach test?

\* \* \* \* \* \*

The Witness: \* \* \*

I did not finish in regard to the Rorschach test in which I indicated that both in the original testing and again in the testing late last summer these female genitalia responses were there and he was making no effort to hide them.

Also, as well as these, there were also—

The Court: When you looked at the Rorschach test, did you get any idea it represented female genitalia?

\* \* \* \* \* \*

The Court: You still think he is sick, don't you?

The Witness: No. As I am trying to say, on the present testing there was no evidence of this type of response, although there was a type of sexual response on there. But it was a nurturing kind of response, female breasts, things of that kind.

The Court: Is there anything in the Rorschach test that would indicate to a normal person female breasts?

The Witness: Yes, there is.

\* \* \* \* \* \*

The Court: Is there anything in the Rorschach test that will lead a normal person to determine that there was a female organ involved?

The Witness: Yes, Your Honor.

The Court: There is?

The Witness: Yes. Female breast is a good, plus response.

The Court: There is nothing about a female breast in the Rorschach test. You are a Clinical Psychologist and and you are telling me that as a result of looking at these ink spots there is a female breast in there?

The Witness: I didn't say there was a female breast there. I said it is not abnormal to see a female breast.

The Court: There isn't?

The Witness: Female breast by standard, statistical analysis has been shown to be a frequent response of normal people and it is a good, plus response.

The Court: A normal person looks at a Rorschach test and sees a female breast, right?

The Witness: Not every normal person, but it is not abnormal to do it. Many normal people do it.

The Court: That's all. Step down. [Transcript, at pages 8, 9, 9–10, 11, 11, 14–15.]

Immediately thereafter, appellant called his second witness, Dr. Charles Murkofsky, a psychiatrist on the staff of Saint Elizabeths. The trial court promptly returned to the same point:

Q Dr. Murkofsky, would you state your name and occupation, for the record, please?

A My name is Dr. Charles Murkofsky—

The Court: Do you agree with the Clinical Psychologist that as a result of the Rorschach test that a normal person gets the idea that there is some female organ there?

The Witness: I would agree that—

The Court: No. I didn't ask you that.

Are you familiar with the Rorschach test?

The Witness: Yes, sir.

The Court: As I am.

Are you going to tell me that a normal person looking at that Rorschach test is going to find anything resembling a female organ?

The Witness: Your Honor, the only way I can answer is to say that some normal people will and some won't.

The Court: You don't know then. You are the psychiatrist and you don't know. Right?

The Witness: I can't answer your question.

The Court: That is pretty good. You can't answer the question.

[Transcript, at pages 15–16]. The trial court continued to return to this subject:

The Witness: May I elaborate an answer, Your Honor?

The Court: Certainly.

The Witness: I think what Dr. Maher was saying is that if you show a stimulus to a large number of people—

The Court: You are talking now about a stimulus. I am asking if you show the Rorschach cards—

The Witness: O.K.

The Court: They are ink spots, aren't they?

The Witness: Yes, sir.

The Court: Is there anything in there that shows a stimulus?

The Witness: There are many stimulus. [*sic*]

The Court: Is there anything in those ink spots that shows a stimulus as to female genitalia?

The Witness: Your Honor, that depends on what is in the person's head who is looking at them.

The Court: If a person's head is looking at it and he concludes there is something like that, isn't there something wrong with him?

\* \* \* \* \* \*

The Court: The man was acquitted of taking indecent liberties with a female, because he was insane. Now you are testing him. And you give him the Rorschach test and he still sees a female organ.

That means nothing to you?

The Witness: Oh, yes, sir. It means something to me.

The Court: What does it mean?

The Witness: It makes me think that—

The Court:—he is sound?

[Transcript 17–18, 21].

Moreover, it appears from the transcript that, in disregard of an *en banc* decision of this court,[8] the trial judge determined that he would give no weight to the psychologist's testimony because he believed psychologists incompetent to testify regarding an individual's mental

8. Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637 (1932) (*en banc*).

condition. Shortly after Dr. Murkofsky was sworn, the following took place:

Q Doctor, your occupation is what?

The Court [sic]: Psychiatrist.

By [appellant's counsel]

Q What do you do?

A I work at St. Elizabeths Hospital as part of the forensic—

The Court: I take it that you agree as a psychiatrist that a Clinical Psychologist is competent to give medical testimony as to a man's insanity?

The Witness: I would agree.

The Court: Then you don't agree with any of the else [sic] of your brothers.

[Appellant's counsel]: The Court of Appeals agrees with that, Your Honor.

The Court: That doesn't make any difference, what the Court of Appeals says. That doesn't convince me.

[Appellant's counsel]: Well, Your Honor, does the Jenkins opinion convince you in its proposing a man—

The Court: I don't think a Clinical Psychologist has any competency to tell me what a man's mental condition is. The Court of Appeals says he does. [Transcript 16–17].

Finally, the proceedings closed as follows:

The Court: How do you know he won't drink, if I release him?

The Witness: Well, because, Your Honor, we have a plan devised to assure that he takes antabuse.

The Court: How?

The Witness: We plan to watch him.

The Court: How?

The Witness: Well, we watch him while he is in the hospital. We give it to him and watch him swallow it. Our plan would be to arrange, when and if he gets to the community, to have a community based clinic [or] physician administer it to him and watch him take it.

The Court: Where did you go to school?

The Witness: University of Rochester.

The Court: Minnesota?

The Witness: Rochester, New York.

The Court: It is a good school.

The Witness: I was going to say.

The Court: You can't convince me that you have a man charged with this type of crime—

I am not going to release him.

[Appellant's counsel]: Judge [———]—

The Court: That is all.

[Appellant's counsel]: Let me just ask the doctor one more question.

The Court: I am not going to release him.

[Appellant's counsel]: Judge [———], when are you going to release him, may I ask?

The Court: I may never release him.

By [appellant's counsel]

Q Doctor, what is the prognosis for this man's total recovery?

The Court: Prognosis?

[Appellant's counsel]: Yes.

The Witness: I would say the prognosis—

The Court:—is bad.

The Witness: The prognosis for him ever being rid of his diagnosis [unspecified sexual deviation] is poor. The prognosis for not acting antisocially is very good, if he doesn't ingest alcohol.

[Appellant's counsel]: Your Honor, the statutory standards are a dual one—

The Court: Take it up to the Court of Appeals. I am not going to release him.

[Appellant's counsel]: Very well, Your Honor. I would like to emphasize one other thing: This man is 61 years old. He has already served

more than the minimum, if he had been convicted.

The Court: He is not serving time. He is at St. Elizabeths.

[Appellant's counsel]: Your Honor, I am not sure he would make that distinction so clearly.

The Court: That could be. If I am wrong, the Court of Appeals can turn him loose. If they turn him loose, there is nothing I can do about it.

But I am not going to turn these people loose that are convicted of this type of a crime.

[Appellant's counsel]: Your Honor, it is not just turning him loose. He would be closely supervised and take this antabuse every day.

The Court: All right. Motion denied.

[Appellant's counsel]: Very well, Your Honor.

[Transcript 25–28].

### III.

I fully agree with my colleagues that the present record would not justify our summarily ordering appellant's conditional release. But on the basis of that

record, no meaningful review of the merits of the trial court's decision is possible. The record contains neither findings of fact nor conclusions of law.[8a] Appellant was denied an adequate opportunity to make the factual basis for his claims clear on the record.[9] An *en banc* decision of this court was disregarded.[10] Finally, at the conclusion of the hearing, the trial court announced its unwillingness to follow the statutory scheme which Congress has created for the treatment and release of those persons who have been acquitted of criminal charges by reason of insanity.[11] We cannot remain silent in the face of such a record.[12]

*First.* We have repeatedly emphasized that proceedings looking toward the release of patients in Saint Elizabeths Hospital are "not strictly adversary proceedings."[13] This fact places a unique responsibility upon the court to see that all the relevant evidence is marshalled towards decision,[14] and that alternative dispositions short of total confinement are adequately explored.[15] In the present case, the government did not oppose the hospital's suggestion that appellant be afforded conditional release, and the government attorney's participa-

---

**8a.** Where one in custody is seeking release from confinement, the failure to file findings of fact and conclusions of law is far more than a mere technicality. Without these findings, appellate review of the merits will often be impossible. In consequence, if the patient eventually prevails he will have suffered a needless period of confinement while the case makes its way to this court only to be remanded for findings and conclusions. In light of Williams v. United States, 132 U.S.App. D.C. 251, 407 F.2d 714 (1969), it can hardly be said that the trial court here was unaware of this requirement. And as Judge Tamm, a District Judge of long experience before coming to this court, said in Davis v. Clark, 131 U.S.App.D.C. 379, 381, 404 F.2d 1356, 1358 (1968), the requirement of findings and conclusions "is not onerous if the matter was dealt with in a conscientious manner in passing on the merits."

**9.** *See* pp. 509–510 *infra.*

**10.** *See* pp. 509, 510 *infra.*

**11.** *See* pp. 511–512 *infra.*

**12.** "The courts of the District of Columbia should not content themselves with enforcing the minimum standards which the Constitution requires. They should also set for the Nation an example of respect for the rights of citizens." Jones v. United States, 119 U.S.App.D.C. 284, 289, 342 F.2d 863, 868 (1964) *(en banc)* (plurality opinion).

**13.** Lake v. Cameron, 124 U.S.App.D.C. 264, 268, 364 F.2d 657, 661 (1966) *(en banc)*, and cases cited *id.* n. 10.

**14.** Dixon v. Jacobs, 138 U.S.App.D.C. 319, 326 n. 20, 427 F.2d 589, 596 n. 20 (No. 23,378, April 10, 1970); Bolton v. Harris, 130 U.S.App.D.C. 1, 12 n. 64, 395 F.2d 642, 654 n. 64 (1967); Lake v. Cameron, *supra* note 13.

**15.** Lake v. Cameron, *supra* note 13 at 268–269, 364 F.2d at 661–662.

tion in the hearing below was minimal.[16] Accordingly, the trial court certainly had the right and perhaps had the duty to insure that any testimony which it found less than convincing was subjected to rigorous cross-examination. Had it done only this, it would deserve commendation.[17] But regrettably, it appears that the court was more interested in providing answers than eliciting them. It regularly interrupted the witnesses,[18] answered its own and counsel's questions,[19] and even sought to block answers that appeared contrary to its own evident views.[20] It interrupted cross-examination of appellant's first witness to return to a point covered several times before, and when the desired answers were still not forthcoming, the witness was dismissed forthwith. Neither appellant's counsel nor counsel for the government was given an opportunity to state whether he desired further examination.[21] Appellant's second witness was answering his first question when the court interrupted, asked a question of its own, and immediately cut off the answer.[22] Finally, at the close of the hearing, the court again interrupted appellant's witness in the middle of an answer, asked a few questions itself, and immediately made its ruling and sought to end the taking of evidence.[23]

*Second.* In Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637 (1962) (*en banc*), the same judge whose action we now review instructed the jury:

> A psychologist is not competent to give a medical opinion as to a mental disease or defect. Therefore, you will not consider any evidence to the effect that the defendant was suffering from a mental disease or a mental defect on June 10, 1959, according to the testimony given by the psychologists.[24]

We reversed and remanded for a new trial, holding *inter alia* that the "critical factor in respect to admissibility [of the testimony of a psychologist] is the actual experience of the witness and the probable probative value of his opinion." [25] In a separate concurring opin-

---

16. I intend by this statement no criticism whatsoever of government counsel. My point is only that, since the government had decided not to oppose the motion for release, if the trial court had believed rigorous cross-examination to be necessary it could have justifiably conducted the examination itself, rather than leaving the matter to counsel.

17. I do not, of course, suggest that this procedure would be proper in a criminal case, or in a case tried before a jury. *See* United States v. Green, 139 U.S.App. D.C. 75, 429 F.2d 754 (June 17, 1970).

18. *See, e. g.*, Transcript 8, 11, 15, 16, 21, 27, quoted at pages 506–509 *supra*.

19. Q Doctor, your occupation is what?
The Court: Psychiatrist.
\* \* \* \* \*
The Court: What does it mean?
The Witness: It makes me think that—
The Court: He is sound?
\* \* \* \* \*
Q Doctor, what is the prognosis for this man's recovery?
The Court: Prognosis?
[Appellant's counsel]: Yes.

The Witness: I would say the prognosis—
The Court: Is bad.
Transcript 16, 21, 27.

20. *Compare* Transcript 14 ("The Court: There is nothing about a female breast in the Rorschah test.") *with* Transcript 15:
The Court: Do you agree with the Clinical Psychologist that as a result of the Rorschach test that a normal person gets the idea that there is some female organ there?
The Witness: I would agree that—
The Court: No. I didn't ask you that.
*See also* Transcript 27, quoted note 19 *supra*.

21. Transcript 14–15, quoted in text at pp. 506–507 *supra*.

22. Transcript 15, quoted in text at p. 507 *supra*.

23. Transcript 25–27, quoted in text at pp. 508–509 *supra*. Cf. Gomez v. Layton, 129 U.S.App.D.C. 289, 291, 394 F.2d 764, 766 (1968).

24. 113 U.S.App.D.C. at 306, 307 F.2d at 643.

25. *Id.* at 309, 307 F.2d at 646.

ion, Circuit Judge (now Chief Justice) Burger noted that

> [t]he issue is not now and never was whether a psychologist's testimony is admissible in litigation where "sanity" is in issue. Such testimony has long been admissible in the form of psychological tests and the analysis and explanation of such tests by a psychologist. *No one doubts that such matter is admissible.*[26]

Nevertheless, the trial judge in the middle of the hearing in this case announced that "That doesn't make any difference, what the Court of Appeals says. That doesn't convince me."[27] "I don't think a Clinical Psychologist has *any* competency to tell me what a man's mental condition is."[28]

I am dubious about the majority's conclusion that the remarks just quoted may fairly be interpreted as "expressing only [the court's] opinion as to the weight of the psychologist's testimony"—that is, as indicating a considered judgment that the professional qualifications of this particular clinical psychologist were such as to divest his testimony of any substantial weight. It seems clear to me that refusal to believe that "a Clinical Psychologist has any competency" to testify on the pertinent issues is nothing less than a continuation of the position we rejected in *Jenkins.* The trial court was under a duty to follow our decision however much he may have disagreed with it. If he was unwilling or unable

to do so, he should have removed himself from the case.

*Third.* Congress has enacted a comprehensive statutory scheme dealing with the involuntary treatment and confinement of the mentally ill.[29] Broadly stated, one who is mentally ill and, because of that mental illness, likely to injure himself or others may be ordered to undertake a course of treatment for his illness.[30] If nothing short of hospital confinement will protect the patient or the public from serious injury, that may be ordered as well.[31] If confinement is ordered, the patient must be unconditionally released if either he recovers his mental health or, although remaining mentally ill, he is no longer likely to injure himself or other persons if given his freedom.[32] Even if unconditional release would not be warranted, a patient is entitled to conditional release if alternatives less restrictive than total confinement may be fashioned that would adequately protect the patient or the public from serious injury.[33]

With a possible exception not here pertinent,[34] these principles are applicable to all commitments, be they labelled "civil"[35] or those that occur following acquittal of crime by reason of insanity.[36] Any person so committed is eligible for conditional release if conditions may be fashioned that will give adequate assurance that the patient and the public will not thereby suffer serious injury. The District Court, of course, is not bound merely to accept or reject the

26. *Id.* at 310, 307 F.2d at 647 (emphasis added).

27. Transcript 17, quoted in text at page 508 *supra.*

28. *Id.* (emphasis added).

29. *See* 21 D.C.Code §§ 501–591 (1967) ; 24 D.C.Code § 301 (1967) ; Dixon v. Jacobs, *supra* note 14 ; Bolton v. Harris, *supra* note 14.

30. *See* Lake v. Cameron, *supra* note 13.

31. Cross v. Harris, 135 U.S.App.D.C. 259, 263, 418 F.2d 1095, 1099 (1969) ; Millard v. Harris, 132 U.S.App.D.C. 146, 406 F.2d 964 (1968), and cases cited.

32. Bolton v. Harris, *supra* note 14, 130 U.S.App.D.C. at 11, 12, 395 F.2d at 653, 654 ; *see* Dixon v. Jacobs, *supra* note 14.

33. Bolton v. Harris, *supra* note 14, 130 U.S.App.D.C. at 12, 395 F.2d at 654.

34. We have never decided whether conditional release is available to persons committed under the Sexual Psychopath Act, 22 D.C.Code §§ 3503–11 (1967). *See generally* Cross v. Harris, *supra* note 31 ; Millard v. Harris, *supra* note 31.

35. 21 D.C.Code §§ 545–46 (1967) ; Lake v. Cameron, *supra* note 13.

36. 24 D.C.Code § 301(e) (1967) ; Bolton v. Harris, *supra* note 14.

conditions proposed by the hospital or the patient; it may impose any lawful conditions on release that it finds necessary to protect the patient and the public from serious harm.[37] At the close of the hearing below, however, the trial court stated flatly, *"I am not going to turn those people loose that are convicted of this type of a crime."* [38] This is, in other words, a determination that notwithstanding the Congressional judgment that each application for release should be evaluated on the merits, no person committed to Saint Elizabeths Hospital following acquittal by reason of insanity on charges of taking indecent liberties with a minor—a charge carrying a *maximum* jail sentence of ten years [39]—will ever be eligible for release. Such a general determination is beyond the lawful power of the trial court. In providing a maximum jail term of ten years for the offense, Congress rejected the proposition that every person found to have engaged in indecent liberties with a minor should be confined for life.[40] An application for release is to be judged not according to the personal predilections of the trial court, but rather according to the applicable legal standards regarding the likelihood of future dangerous behavior by the patient [41] and the evidence presented in each individual case.[42] A flat refusal even to consider release for any particular class of patients is directly contrary to the statutory scheme.

### IV.

In sum, I do not believe we may fairly remain silent with the present record before us. A judge may understandably have personal feelings of revulsion about certain kinds of deviant behavior. But all litigants in our courts are entitled to a fair hearing of their claims. The importance of such matters far transcends the interests of any individual litigant. "Our concern is with the fair administration of justice. The record discloses not a rare flare-up, not a show of evanescent irritation—a modicum of quick temper that must be allowed even judges," Offut v. United States, 348 U.S. 11, 17, 75 S.Ct. 11, 15, 99 L.Ed. 11 (1945) (Frankfurter, J.), but an unwillingness to accept the very laws the court is bound to administer. If we are to concern ourselves with the conduct of litigants and their attorneys in the courtroom, we can hardly blind ourselves to the conduct of the most prominent participant in the proceedings.

In the last analysis, respect both for law and for courts cannot be commanded by sanctions, however severe. Respect must be earned. Plainly, it was not on the record before us.

### V.

Since the present case is to be remanded for the taking of further evidence, I believe it important that we make clear the respective roles of the court and the expert witnesses in cases of this nature, in order to assure that the merits of appellant's claim are properly considered without risking yet another appeal and remand. As I have said, under our statutes a person committed to Saint Elizabeths Hospital is to be released from the hospital when complete confinement is no longer necessary to protect the individual or the public from serious in-

---

37. Sources cited note 36 *supra.*

38. Transcript 27 (emphasis added).

39. 22 D.C.Code § 3501(a) (1967). Even a defendant sentenced to the maximum ten years' imprisonment would be eligible for release after serving a third of that sentence.

40. Of course, the statute contemplates that some persons committed for treatment of mental illness may be subject to compulsory treatment or even confinement for longer than the maximum allowable sentence for the behavior in which they were found to have engaged.

41. *See* Dixon v. Jacobs, *supra* note 14, 138 U.S.App.D.C. at 325 n. 17, 427 F.2d at 595 n. 17, and cases cited.

42. *See* Millard v. Harris, *supra* note 31, 132 U.S.App.D.C. at 155–160, 406 F.2d at 973–978.

jury.[43] For those persons who have been committed under the provisions of the Hospitalization of the Mentally Ill Act [44] —so-called "civilly committed" persons —no judicial action is necessary once the hospital determines that the statutory standards for release have been met.[45] In this regard, persons hospitalized following acquittal of criminal charges by reason of insanity stand in a somewhat different position. In such cases Congress, in order to insure the integrity of the hospital's determination that the patient's condition meets the statutory standard for release, has provided that release must be preceded by a judicial determination that the statutory standards for release have been met.[46] In Bolton v. Harris,[47] we expressly upheld this distinction between these two classes of patients committed to the hospital.[48]

The role of the court in such proceedings is a complex and difficult one. It must first determine, as a matter of fact, the patient's present mental condition; and, if the patient is presently suffering from a mental illness, what effect that illness is likely to have upon the patient's future behavior.[49] The court must then measure these facts against the statutory standard for compulsory treatment [50] to determine if any restraint whatsoever is warranted. If so, the court must next examine possible conditions that may be placed upon the patient's release, and the extent to which those conditions may be expected to alleviate any harm that otherwise might result from the patient's unmodified behavior.[51] If a combination of conditions may be found that would reduce the likelihood of dangerous behavior below the standard required for commitment, the court should order the patient's release upon those conditions.[52]

The trial court is, of course, responsible for making the findings of fact upon which the ultimate determination of the patient's eligibility for release will rest. These findings, however, must invariably "be made on the basis of the

43. *See* notes 29–33 *supra* and accompanying text.

44. 21 D.C.Code §§ 501–591 (1967).

45. 21 D.C.Code § 546 (1967).

46. 24 D.C.Code § 301(e) (1967). The point of this requirement is that the standards justifying release are matters of law. That is, a patient is entitled to release if he is no longer "mentally ill" or if, although he remains "mentally ill," he is no longer because of that illness likely to injure himself or other persons if released. Although the patient's present mental condition is a matter of fact within the province of the experts, whether that mental condition is a "mental illness" within the statutory definition, 21 D.C.Code § 501 (1967), is a matter of law. Similarly, although the patient's expected future behavior, and the harm likely to result from that behavior, are matters for expert psychiatric opinion, whether the harm is of sufficient magnitude to warrant commitment, and whether the *likelihood* of that harm is sufficient to warrant commitment, are again matters of law. *See* Cross v. Harris, 135 U.S.App.D.C. 259, 263, 418 F.2d 1095, 1099–1101 (1969); Dershowitz, "Psychiatry in the Legal Process: 'A Knife that Cuts Both Ways,'" Address Delivered at the Harvard Law School Sesquicentennial Celebration, September 22, 1967.

47. 130 U.S.App.D.C. 1, 395 F.2d 642 (1967).

48. *Id.* at 11, 395 F.2d at 653.

49. *See* Dixon v. Jacobs, 138 U.S.App.D.C. 319, 325 n. 17, 427 F.2d 589, 595 n. 17 (No. 23,378, April 10, 1970); Cross v. Harris, *supra* note 46.

50. Compulsory treatment may be ordered if an individual is "mentally ill and, because of that illness, is likely to injure himself or other persons if allowed to remain at liberty." 21 D.C.Code § 545(b) (1967). If no "other alternative course of treatment" will adequately protect the patient and the public from serious harm, hospitalization may be ordered. *Id.*; Lake v. Cameron, 124 U.S.App.D.C. 264, 364 F.2d 657 (1966) (*en banc*). The standards for release are simply the converse of the standards for compulsory treatment or commitment. *See* 21 D.C.Code § 546 (1967); Bolton v. Harris, *supra* note 47.

51. *See* Lake v. Cameron, *supra* note 50.

52. *See* 24 D.C.Code § 301(e) (1967); Cross v. Harris, *supra* note 46; Bolton v. Harris, *supra* note 47.

record in the particular case before the court."[53] That the trial court is charged with the important duty of superintending the hospital's application of the legal standards for release to the particular patient does not mean that the court may substitute its own opinions for uncontradicted expert testimony with regard to *factual* matters within the specialized competence of psychiatrists and psychologists.[54]

It is often the case with the behavioral sciences that opinions of qualified experts will differ with regard to the mental condition or expected future behavior of an individual patient.[55] In such cases, the trial court as trier of fact must ultimately resolve any relevant conflicts in the expert testimony. Such resolution may properly be based upon matters before the court in the case at hand, such as the relative experience of the experts whose opinions conflict, their opportu-

nity for examination and observation of the patient, the internal consistency of the experts' own testimony, and perhaps even their demeanor on the witness stand.[56] Similarly, even where the expert testimony is uncontradicted, it might be possible to imagine a situation in which the experts' opportunity for examination of the patient was so limited, or their experience with such cases so minimal, that the trial court would be justified in rejecting their testimony *in toto*. In such a case, the usual remedy would presumably be to order further examination of the patient, or to appoint other qualified experts to examine the patient and testify as to their conclusions. In no event would complete rejection of the expert testimony justify ordering the patient's return to the hospital for an indefinite period. Instead, it would require the court to order the patient's release: for since commitment

53. Cross v. Harris, *supra* note 46, 135 U.S. App.D.C. at 264, 418 F.2d at 1100.

54. Of course, expert witnesses may not shield their actions and judgments from judicial scrutiny by testifying in merely conclusory terms, even if that conclusory testimony is without contradiction. In such cases, of course, the court may appropriately inquire into the basis for the expert's conclusions. For a fuller discussion of this point in the context of a patient's challenge to the adequacy of treatment that he is receiving, see Covington v. Harris, 136 U.S.App.D.C. 35, 39–45, 419 F.2d 617, 621–627 (1969); Rouse v. Cameron, 125 U.S.App.D.C. 366, 371–376, 373 F.2d 451, 456–461 (1966); for a psychiatrist's view, see Malmquist, The Delinquent and the Insane: Right and Adequacy of Treatment, 40 Am.J. Orthopsychiatry, 388 (1970).

55. *See, e. g.*, the psychiatric testimony set out in the concurring opinion in United States v. Carter, 141 U.S.App.D.C. ——, —— – ——, 436 F.2d 200, 203–207 (June 5, 1970). It is important to recognize, however, that in some cases an apparent conflict may indicate not disagreement with regard to matters within the competence of the experts, but merely disagreement with regard to the legal consequences that should be drawn from the same state of facts. For example, in Williams v. Robinson, 139 U.S.App.D.C. 204, 432 F.2d 637 (decided June 19, 1970), a patient's

application for release was opposed by the hospital because, in the opinion of his doctor, he was at the time "mentally ill" and thought to be dangerous. Subsequent to the hearing below in that case, government counsel filed with this court a statement indicating that although Williams' doctor did not believe that his patient's condition had changed, he now felt that it did not amount to a "mental illness" within the meaning of the statute. That, of course, was a legal conclusion and not a medical one. *See* note 46, *supra* and materials there cited.

56. In this regard a caveat is in order. As a general matter, of course, the demeanor of a witness on the stand may be considered by the trier of fact in assessing the truth of the witness's testimony. 3 J. Wigmore, Evidence § 946 (3d ed. 1940). It may be that, notwithstanding their oath, psychiatrists as well as other witnesses occasionally lie in court. But where an indigent seeking his liberty must rely upon expert witnesses provided by the government to present his case, it would seem that a finding that those witnesses were lying would raise a serious question whether the patient had been denied due process of law, a violation which might itself require the patient's release. At the very least, if the trial court finds that such a witness has been untruthful it should specifically so state in its findings.

must be based upon psychiatric testimony,[57] complete rejection of that testimony would entirely remove the only lawful basis for commitment.

Where uncontradicted expert testimony is provided with an adequate foundation, the trier of fact may not simply pick and choose among the experts' opinions, accepting some and rejecting others according to his own personal views. Our cases are "not authority for disregarding expert testimony. It must be considered with the other evidence, not arbitrarily rejected." [58] And the trial court's opinions, however strongly held, are not evidence in the case. To begin with, judges are not experts in the behavioral sciences, trained in the diagnosis of mental diseases and defects and in predicting their effects upon human behavior. But even if they were, this fact would not justify decision on the basis of those opinions. The Supreme Court has recently reiterated the "elementary" requirement of due process that "the decision maker's conclusion * * * must rest *solely* on the legal rules and evidence adduced at the hearing." [59] Decision on the basis of the trial court's personal opinions, no matter how well founded, would deny the litigant this right, as well as the right to cross-examination and to an impartial decision maker.[60]

In short, the point of requiring judicial supervision of the release of patients hospitalized following acquittal of crime by reason of insanity is to protect the patient and the public by insuring that statutory standards for release are not subverted by allowing the ultimate determination to be made according to the individual, subjective standards of the hospital staff. This judicial supervision, however, does not entitle the trial court to substitute its own opinions for uncontradicted expert testimony. Determination of the patient's present mental condition, and of the behavior in which he may be expected to engage if released, must be made on the basis of the expert testimony in the record. Given the facts established by that testimony, including of course the necessary resolution of any relevant conflicts, the function of the trial court is to determine if these facts measure up to the statutory standards for release.

---

57. *See* 21 D.C.Code § 545 (1967); Bolton v. Harris, *supra*, note 47.

58. Douglas v. United States, 99 U.S.App. D.C. 232, 239, 239 F.2d 52, 59 (1956).

59. Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970) (emphasis added); *cf.* Cross v.

Harris, *supra* note 46, 135 U.S.App.D.C. at 263–265, 418 F.2d at 1099–1101.

60. Goldberg v. Kelly, *supra* note 59. The judge, of course, cannot be cross-examined, and no judge could be expected fairly to weigh what is in effect his own testimony against testimony of other witnesses.