THE STATE OF MONTANA, Plaintiff and Respondent, v.
JACK KENNETH TAYLOR, Defendant and Appellant.

No. 12078.
Submitted Sept. 30, 1971.
Decided Dec. 13, 1971.
Rehearing Denied Jan. 7, 1972.
491 P.2d 877.

MR. JUSTICES HASWELL and DALY, filed opinion concurring in part and dissenting in part.

Francis J. McCarvel, argued, Glendive, John Ulrich, Mont. Legal Service Assn., appeared, Helena, for defendant and appellant.

Robert L. Woodahl, Atty. Gen., Helena, David V. Gliko, Asst. Atty. Gen. argued, Helena, Kenneth Haag, County Atty., appeared, Glendive, for plaintiff and respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

Defendant, Jack Kenneth Taylor, was charged with the crime of murder in the second degree on January 29, 1968. On April 19, 1968, a jury verdict was returned finding defendant "NOT GUILTY by reason of mental disease or defect excluding criminal responsibility." Following defendant's acquittal, Hon. L. C. Gulbrandson, district court judge of the seventh judicial district, county of Dawson, ordered defendant committed to the custody of the superintendent of the Montana state hospital at Warm Springs, for care and treatment. Section 95-508(a), R.C.M.1947.

On December 5, 1969, after being hospitalized for some nineteen months, pursuant to section 95-508(e), R.C.M.1947, defendant petitioned for his release from the state hospital on the grounds "that his condition is such that he can be released and returned to society without danger to himself or other members of society." Acting on the petition, the court appointed two qualified psychiatrists to examine defendant and report to the court their opinions as to his mental condition. After submission of the reports, a hearing was held to determine whether defendant could be safely released or discharged. At the conclusion of the hearing and after all evidence had been submitted, the district court held the "evidence is insufficient for the Court to determine that the petitioner may safely be discharged or released without danger to himself or others."

Defendant appeals, contending that while he has the burden of proving that he may be safely discharged or released, the standard of proof required is a preponderance of the evidence and he has met that standard. In the alternative, defendant argues the district court should have ordered his release upon such conditions as the court should determine to be necessary for the protection of defendant and society under the provisions of section 95-508(c), R.C.M.1947.

In 1967, the legislature enacted section 95-508, R.C.M.1947, outlining the procedures for the commitment and subsequent

discharge of one acquitted of a crime by reason of mental disease or defect. Section 95-508(a), R.C.M.1947, provides for the mandatory commitment of such person to the "custody of the superintendent of the Montana state hospital" for care and treatment, following acquittal.

Section 95-508(b), R.C.M.1947, provides that if the superintendent believes the person committed to his custody "may be discharged or released on condition without danger to himself or others, he shall make application for the discharge or release of such person in a report to the court * * *." The court must then "appoint at least two (2) qualified psychiatrists to examine such person and to report * * * their opinion as to his mental condition" to the court.

Section 95-508(c), R.C.M.1947, provides: "If the court is satisfied by the report filed" by the psychiatrists, and such other testimony "as the court deems necessary that the committed person may be discharged or released on condition without danger to himself or others, the court shall order his discharge or his release on such conditions as the court determines to be necessary." If the court is not satisfied, it shall order a hearing to determine the merits of the superintendent's application and "such hearing shall be deemed a civil proceeding and the burden shall be upon the committed person to prove that he may be safely discharged or released."

Section 95-508(d), R.C.M.1947, provides for the recommitment of any conditionally discharged or released person within five years, if the conditions of such discharge or release have not been fulfilled and recommitment is deemed necessary for his safety "or for the safety of others * * *."

Section 95-508(e), R.C.M.1947, provides for a *pro se* application by the committed person, the appointment of two qualified psychiatrists, their report, and a subsequent hearing, as provided for in sections 95-508(b) and (c). However, the court need not consider any such *pro se* application until such

person has been confined to the state hospital for care and treatment "for a period of not less than six (6) months * * *."

The Criminal Law Commission comment to section 95-508, R.C.M.1947, sets forth the legal effect of an acquittal and the criterion to be used for continued custody.

"The legal effect of acquittal on the ground of mental disease or defect excluding responsibility is characterized by (a) mandatory commitment of the defendant to an appropriate institution upon such an acquittal, (b) dangerousness to himself or others as the criterion for continued custody, (c) power only in the committing court (other than as affected by habeas corpus) to discharge or release the defendant, (d) probationary release as an alternative to absolute discharge, (e) application for release or discharge to be made by the superintendent of the Montana State Hospital or by the defendant with limitations as to the frequency of applications by the defendant. * * * It seems preferable to make dangerousness the criterion for continued custody rather than to provide that the committed person may be discharged or released when restored to sanity * * *. *Although his mental disease may have greatly improved, such a person may still be dangerous because of factors in his personality and background other than mental disease.* Also, such a standard provides a possible means for the control of the occasional defendant who may be quite dangerous but who successfully feigned mental disease to gain an acquittal. The prescribed procedure protects both the public and the defendant by providing for an independent psychiatric examination of the defendant before action on the application for release, and then either for summary favorable action on the application or a full hearing. The provision for release on probation furnishes additional protection to the public in the case of those individuals who need some supervision upon their return to the community." (Emphasis supplied)

On January 2, 1968, Jack Taylor committed an act of second

degree murder by shooting one Clay Tennant without any apparent provocation or premeditation. The shooting occurred in a bar where Taylor had been drinking and dancing. At the trial presided over by the same judge who heard this application for release, the defense of mental disease or defect was raised and supported by the testimony of the defendant who maintained he had "blacked out" during the incident and was unable to recall any of the events leading up to, during, or immediately after the shooting. Defendant's testimony was further supported by the testimony of one Dr. Freese, a Miles City psychiatrist, who had been treating defendant for some time prior to the date of the shooting. Dr. Freese testified that in his opinion defendant was suffering from mental disease; that his prognosis was "very poor;" and, that defendant "should be hospitalized for many years" with "intensive use of medications to help stabilize his emotional ability."

The jury returned a verdict of not guilty by reason of mental disease or defect and defendant was committed in April 1968, to the Montana state hospital in accordance with section 95-508(a), R.C.M.1947.

On December 5, 1969, defendant petitioned for release pursuant to section 95-508(e), R.C.M.1947, alleging that he "believes that his condition is such that he can be released and returned to society without danger to himself or other members of society." The district court appointed Drs. Calixto Punzalan and Harry C. Xanthopoulos, psychiatrists at the Montana state hospital, to examine defendant and report to the court their opinions as to his mental condition.

Both psychiatrists submitted letters to the court describing Taylor as having "made a good adjustment in the hospital setting" and that while at the hospital he had "not exhibited any type of psychosis." Dr. Xanthopoulos submitted two letters to the court. The first one described Taylor as "selfish, callous, irresponsibile, impulsive, and unable to feel guilt or learn from experience and punishment." In his second letter, Dr. Xanthopoulos stated:

"We have been asked to express an opinion if this man is able to be returned to society. In view of his past history and lack of judgment, it would be impossible to predict his future behavior and this applies to any patient."

Not being satisfied that defendant should be released on the strength of the psychiatrists' letters,. the district court ordered a hearing to be held pursuant to section 95-508(c), R.C.M.1947. Defendant and Dr. Punzalan were the only witnesses at the hearing. Dr. Xanthopoulos was later deposed and his deposition submitted to the court.

Defendant testified that as a result of being committed to the state hospital he has gained a substantial insight into his problem; that he now realizes his previous difficulties were the result of his use of alcohol; and, that he never realized he was an alcoholic until he attended a six week course on alcoholism at the Galen hospital. That during his commitment he has worked as a chaplain's assistant, a baker's helper, and as a butcher and although he was confined to the maximum security ward for the first three months, he has since been granted full grounds parole and lives on a ward that is completely self-governing—that is, there is no attendant on duty on his particular ward.

Defendant did admit that in March 1969, he escaped from the state hospital and went to Olympia, Washington, where he worked for one month as a carpenter and as a longshoreman, until he was apprehended by the local police as a "runaway" from the Montana state hospital.

Defendant's plans for the future, should he be released, include moving to Oklahoma where he apparently has a job awaiting him and to join Alcoholics Anonymous.

Dr. Punzalan testified that while he had not treated defendant, he had talked with him, examined his past record, and had had the opportunity to observe his behavior. It was Dr. Punzalan's opinion that:

"* * * based on my examination at the time of my

examination, I saw him very cooperative, patient, nonhostile and he is coherent in every manner, he is oriented in everything, and he does not show any signs of psychosis, as we call delusions, or hallucinations, like this."

Dr. Punzalan further stated that in his opinion "Mr. Jack Taylor will be safe at the present time to be out in society;" that he does not now possess a low frustration point nor is there any indication of the presence of an antisocial personality. He did not find Taylor to be "selfish, callous, irresponsible, [or] impulsive" as was indicated in Dr. Xanthopoulos' first letter.

Laboratory tests (electroencephalogram) at the Montana state hospital "suggest" that Taylor is suffering or has suffered from organic brain syndrome which was defined by Dr. Punzalan as "brain damage that * * * will produce memory impairment." This organic brain syndrome, coupled with Taylor's previous use of alcohol, has had the effect of causing him to relax or lose his normal inhibitions, leads him to trouble and causes memory "blackout" as to the events that transpire during his drinking episodes.

Dr. Punzalan was advised and reminded during the hearing that the issue before the court was not defendant's sanity, but rather his potential dangerousness to himself and society. On the issue of dangerousness, Dr. Punzalan stated that while Taylor is not now dangerous, he could become so if he were to revert to his former drinking habits. He said that it would be "hard to predict" Taylor's future conduct, but he also pointed out that this applies to any individual.

In his first letter to the court dated March 2, 1970, Dr. Xanthopoulos described Taylor as having an antisocial personality. He defined this term in his deposition as "a character or behavior disorder and the individual tends to be a loner and get into trouble usually with the laws and codes of society." He indicated it to be a character type person rather than a mental condition.

On cross-examination, Dr. Xanthopoulos stated that he would not guarantee Taylor's future behavior but also pointed out he would not guarantee any individual's future behavior because under certain conditions, we are all capable of homicide.

Defendant's first contention is that the standard of proof required of persons committed to the state hospital under section 95-508(a), R.C.M.1947, is or should be a preponderance of the evidence and not any greater standard. We cannot agree with this contention. By the very nature of the reason for defendant's commitment to the state hospital, any conditions for his release must be established by evidence convincing in its effect beyond a reasonable doubt that the release could be effected without danger to the public. State v. Shackford, Me. 1970, 262 A.2d 359.

Inherent in the findings of the jury that the defendant, when tried for the murder of Clay Tennant, was not guilty by reason of mental disease or defect, is the conclusion that the killing was a part of his mental disease or defect. By so finding, the jury put defendant in what some courts have called an "exceptional class of people." Overholser v. Leach, 257 F.2d 667, 669. He became one who is to be held blameless, free from imprisonment for an act otherwise subject to penal sanctions.

As noted in *Shackford,* the legislature determined that when one enters this exceptional class, the reasonable and humane thing to do is to commit him to a mental hospital where he can undergo treatment which will, hopefully, enable him to return to society as a useful member, posing no threat to either his or the general public's safety. However, the public acquires a special interest in his confinement and release, which interest must be considered by the court. When consideration is being given to his release, that public interest must be weighed against his claimed right to be set free.

Though our statutes set no standard of proof, we find

it reasonable to require that both medical and judicial doubts be resolved in favor of the public. Overholser v. Russell, D. C., 283 F.2d 195. We find this standard of proof confirmed by the Criminal Law Commission comment heretofore quoted.

Here, we must determine whether defendant has met his burden of proof. The entire record on appeal reveals that only three witnesses testified or submitted evidence relevant to defendant's dangerousness—defendant and two state hospital psychiatrists. Defendant's testimony is selfserving. Defendant's record while confined to the state hospital shows that he has held several jobs, including one [butcher] requiring the use of potential weapons; that he has demonstrated his ability to get along with others and to participate in group therapy; that he has completed the alcoholic's training and rehabilitation course; and, that he recognizes he is an alcoholic and he must abstain from the use of alcohol in the future. The hospital record also reveals that he escaped to Olympia, Washington. The hospital laboratory tests "suggest" he suffers from an organic brain syndrome.

While Dr. Punzalan testified that Taylor is safe to be out in society, it is "hard to predict his future course of conduct" apparently because his future conduct is dependent upon abstaining from the use of alcohol.

Dr. Xanthopoulos was more guarded in his opinion. He stated Taylor should be released "conditionally" and the conditions of such release should include abstaining from alcohol and follow-up psychiatric treatment. Although Dr. Xanthopoulos indicated that "the hospital would be willing to make arrangements or at least attempt to make arrangements for some sort of follow-up" treatment, no specific program was proposed to the court. Nor was there any suggestion that the authorities in Oklahoma would be willing to participate in such a program.

On these facts, has the defendant demonstrated evidence beyond a reasonable doubt sufficient to move the dis-

cretion of the district court that, if released, he will not be dangerous either to himself or society? We think not. Taylor has been diagnosed as having a schizoid personality. While, medically, this is not a mental disease or defect, it is a character disorder "well known for its relapsable potentialities." State v. Shackford, Me.1970, 262 A.2d 359, 364. The catalyst which would or could possibly cause Taylor to "blackout" and resort to violence, is alcohol. The record is devoid of any guarantee that Taylor will abstain from the use of alcohol. The efforts of the hospital staff and the progress Tayloor has made are admirable; but when Taylor was acquitted of second degree murder by reason of mental disease or defect, the public acquired a special interest in his confinement and subsequent release and it is the court's duty to protect that interest.

When the legislature made "dangerousness" the criterion for continued custody, it placed the burden upon the defendant to establish evidence beyond a reasonable doubt that he will not be dangerous in the foreseeable future. This he has failed to do. There is no guarantee, nor will the doctors predict, that Taylor will not consume alcohol, if released. Even though the evidence indicates defendant has abstained during his confinement, he has done so within the confines of a controlled environment. If he were to be released and be subject to the pressures of everyday life without having recourse to the sanctuary of the hospital, he might resume his former habits with resulting violence. This assurance, we have not been offered.

Dr. Freese testified in 1968 that Taylor "should be hospitalized for many years." In the absence of a specific program providing for treatment following release, and due to the accessibility and temptatious nature of alcohol, we feel defendant's unconditional release at this time is not warranted by the evidence.

Defendant's second contention on appeal is that in the event the court found him not acceptable for an unconditional re-

lease, the court should have ordered his conditional release under the provisions of section 95-508(c), R.C.M.1947. That section provides the court may release a committed person "* * * on such conditions as the court determines to be necessary." Taylor's problem is analogous to that presented in United States v. McNeil, 434 F.2d 502 (1970), where the defendant's problem manifested itself only while he was under the influence of alcohol. In *McNeil* the hospital officials proposed a plan to the court whereby McNeil would be released on the condition that he abstain from ingesting alcohol and report daily to a clinic for the administration of antabuse.

█ While we agree with Chief Judge Bazelon's concurring opinion in *McNeil* that "Any person so committed is eligible for conditional release if conditions may be fashioned that will give adequate assurance that the patient and the public will not thereby suffer serious injury.", neither the facts nor the record in the instant case warrant such a release. No plan was proposed either by the hospital or defendant for the trial judge's consideration. The record does not show satisfactory evidence upon which the trial judge could grant a conditional release as provided by statute. Except for defendant's testimony, which is self-serving, the evidence given by the two psychiatrists was "guarded" as to whether defendant would be "dangerous."

█ Under Montana statutes, any individual committed to the state hospital is to be released from the hospital when complete confinement is no longer necessary to protect the individual or the public from serious injury. However, individuals hospitalized following acquittal of crinminal charges "by reason of mental disease or defect excluding criminal responsibility" stand in a somewhat different position. In such cases the legislature in order to insure the integrity of the hospital's determination that the individual's condition meets the statutory standard for release, has provided the release must be preceded by a judicial determination that the statutory stand-

ards for release have been met. Section 95-508(c), R.C.M.1947.

Ultimately the point of requiring the judicial supervision of the hospitalized individual following acquittal of a crime by reason of "mental disease or defect excluding criminal responsibility," is to protect the public as well as the individual by insuring that standards for release are not subverted by allowing the final determination to be made according to the individual subjective standards of the hospital staff.

Here, the same trial judge presided over the second degree murder trial, committed defendant, and heard the request for defendant's release. He had all of the trial evidence before him at the hearing of defendant's request to be returned to society. He had the hospital records of the laboratory tests suggesting that defendant suffered from "organic brain syndrome" which indicated "brain damage that * * * will produce memory impairment." He was aware that defendant had left the hospital for a month and had to be apprehended and returned to the state hospital. He had to consider the rather "guarded" testimony of the two state hospital psychiatrists and was aware that at the trial Dr. Freese had testified that in his opinion defendant suffered a mental disease, his prognosis was "very poor" and defendant should be "hospitalized for many years" with "intensive use of medication to help stabilize his emotional ability."

Too, it should be noted that this application is by the defendant under section 95-508(e), R.C.M.1947, and not an application by the superintendent of the state hospital provided for by section 95-508(b), R.C.M.1947. The state hospital superintendent is noticeably absent from any participation in the proceedings; a fact the trial judge no doubt gave considerable consideration for had the superintendent felt defendant ready for release he could have moved for his discharge under section 95-508(b), R.C.M.1947.

While the determination of defendant's mental condition and his expected behavior, if released, must be on

the basis of expert testimony, the trial court could weigh such opinion evidence but he is not bound by it. He could reject it if, in his judgment, the reasons given for the testimony were unsound. Under Montana statutes the trial court, the committing court, has the power to discharge or conditionally release the defendant.

We feel it necessary to briefly comment on the separate concurring and dissenting opinion of Justices Haswell and Daly. We concur with that opinion as to the analysis of the opinion evidence in the instant case. We do not consider the distinction between the standards of evidence; that is a "preponderance of evidence" or "evidence beyond a reasonable doubt" to be as vital as the dissenting Justices would imply. But, the public is entitled to the protection from one who has committed a criminal act but is "excused" by society because of his mental condition. To establish that mental condition as being no longer dangerous, we do not believe it unwarranted to have evidence excluding any other reasonable hypothesis. We emphasize "reasonable hypothesis" and do not feel that such proof is "virtually impossible." As a matter of fact, applying the standards as to the weight and sufficiency of the evidence from the jury instruction quoted, where the opinion is given based upon reasonable medical certainty, that, absent conflicting or contradictory evidence, would ordinarily exclude any reasonable hypothesis and be sufficient to move the discretion of the trier of fact.

Judgment affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICE CASTLES, concur.

MR. JUSTICES HASWELL and DALY (concurring in part and dissenting in part):

We concur with the majority in affirming the decision of the district court, but we disagree with the rationale contained

in the majority opinion and specifically dissent to the majority holding on the degree of proof required.

The ultimate issue upon appeal is the sufficiency of the evidence to sustain the district court's refusal to discharge applicant from the Montana state hospital pursuant to the procedure and requirements of section 95-508, R.C.M.1947. Under this statute, discharge requires a finding by the district court that applicant's "condition is such that he can be released and returned to society without danger to himself or to other members of society." The district court here refused to make such finding, but instead found "the evidence was insufficient for the court to determine that petitioner may safely be discharged or released without danger to himself or others."

The evidence on this point consisted largely of conflicting expert opinion evidence of two psychiatrists at the Montana state hospital whose conclusions were based on applicant's past history and behavior together with medical and psychiatric examinations. Where, as here, the district court is trier of the facts, its consideration of the weight and sufficiency of the evidence is governed by the same principles set forth in the standard instruction on this subject given to a jury in a jury case:

"The rules of evidence ordinarily do not permit the opinion of a witness to be received as evidence. An exception to this rule exists in the case of expert witnesses. A person who by education, study and experience has become an expert in any art, science or profession, and who is called as a witness, may give his opinion as to any such matter in which he is versed and which is material to the case. You should consider such expert opinion and should weigh the reasons, if any, given for it. You are not bound, however, by such an opinion. Give it the weight to which you deem it entitled, whether that be great or slight, and you may reject it, if in your judgment the reasons given for it are unsound." 1 Cal.Jur.Inst.Civ. 4th, No. 33.

Applying these principles to the instant case, the district court's finding that the evidence was insufficient to determine that applicant could safely be discharged was supported by substantial credible evidence. Applicant's prior escape from the hospital, his organic brain damage, his past history of drinking and its effect on his behavior, and the conflicting opinions of the two psychiatrists constitute substantial evidentiary support for the district court's determination.

Our duty in reviewing findings of fact in a civil action tried by the district court without a jury is confined to determining whether there is substantial credible evidence to support them, and we will not disturb the district court's findings unless there is a clear preponderance of evidence against them. State Highway Com'n v. West Great Falls F.C. & D.D., 155 Mont. 157, 468 P.2d 753, and cases cited therein.

We specifically dissent from the majority holding that an applicant under section 95-508, R.C.M.1947, must prove his entitlement to discharge from the Montana state hospital "beyond a reasonable doubt." This is the degree of proof required of the state to convict in a criminal case. Section 94-7203, R.C.M.1947 and section 93-2001-1, R.C.M.1947. This degree of proof requires the exclusion of any other reasonable hypothesis. In our view it is entirely unwarranted to require this degree of proof from a patient seeking discharge from the Montana state hospital pursuant to section 95-508, R.C.M. 1947.

The statute itself expressly provides that a section 95-508 hearing "shall be deemed a *civil* proceeding." The degree of proof required of an applicant for relief in a civil proceeding is "a preponderance of the evidence." Section 93-2001-1(5), R.C.M.1947. This simply means the greater weight of the evidence, or evidence having the more convincing force when weighed against the opposing evidence. Montana Jury Instruction Guide, #21.00, and cases cited thereunder.

Proof "beyond a reasonable doubt" is virtually impossible

when predicting the future human behavior of an individual under unknown and indeterminable circumstances of future stress to which he might be subjected. In the words of Dr. Xanthopoulos, quoted in the majority opinion:

"We have been asked to express an opinion if this man is able to be returned to society. In view of his past history and lack of judgment, it would be impossible to predict his future behavior *and this applies to any patient.*" (Emphasis added)

And again the doctor testified on cross-examination as indicated in the majority opinion that he wouldn't guarantee any individual's future behavior because under certain conditions, we are all capable of homicide.

The statute quite properly places the burden of proof on the applicant for the protection of the public. However, it does not require the majority's impossible and unattainable degree of proof. In our view the majority holding is tantamount to converting the Montana state hospital into a lifetime custodial institution from which there is no possibility of discharge.