John Joseph CLARKE, Jr., a minor, by Muriel Clarke, his mother and next friend, and Muriel Clarke, Appellants,

v.

**Dagmar O'CONNOR.**

**No. 22686.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 15, 1970.

Decided Oct. 15, 1970.

---

25. 9 Moore, Federal Practice, ¶ 81.06 [1] (1954).

Mr. Armin U. Kuder, Washington, D. C., with whom Mr. John O. Fox, Washington, D. C., was on the brief, for appellants.

Mr. Jerome S. Berg, Washington, D. C., with whom Mr. Lawrence E. Carr, Jr., Washington, D. C., was on the brief, for appellee.

Before LEVENTHAL, ROBB, and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

Appellant-plaintiff, a seven year old boy,[1] was injured when his face came in contact with the blades of a fan installed in a window of a house owned by defendant. At the time of his injury he was on the premises as the guest of Miss Gail Davis, one of several tenants of the house under a lease from appellee-defendant. Appellant brought this action for personal injuries, alleging negligence on the part of appellee. At the close of appel-

lant's case the trial court granted a directed verdict for the appellee landlord on the theory that in the circumstances presented no duty was owed by the defendant to the plaintiff, the breach of which would amount to negligent conduct.

In reviewing the correctness of this determination, we are mindful that the concept of "duty" known to the law of torts is a rather artificial one, and that in deciding whether a duty existed, the real question to be answered is whether the law should safeguard the plaintiff from the consequences of the defendant's conduct. As Dean Prosser has put it,

> [I]t should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection. * * *
> and that as our ideas of human relations change, the law as to duties [changes] with them. * * * Changing social conditions lead constantly to the recognition of new duties.[2]

After careful review of the record in the instant case we have concluded that the trial court erred in deciding that defendant owed no duty to the plaintiff, thereby withdrawing the case from the jury. In order to explicate the basis for this conclusion it is necessary to recite the facts in some detail.

### I. Pertinent Facts

Appellee O'Connor is the owner of a three-bedroom row house located at 2703 Woodley Place, N.W. In the summer of 1965 these premises were occupied by a group of English girls under a lease from appellee. During that summer these girls requested Mrs. O'Connor to provide some means of cooling the house. Mrs. O'Connor responded by purchasing two air conditioners and two window

---

1. The minor plaintiff originally brought suit by John J. Clarke, his father and next friend, who also sued in his individual capacity. Subsequently, the present co-appellant, Muriel Clarke, the minor's mother, was substituted for the father in both his individual and representative capacities. Both the minor and his mother are hereinafter referred to as "appellant."

2. W. Prosser, Torts 332–333 (3rd Ed. 1964).

fans. Her testimony indicates that she had definite ideas as to where and how these apparati were to be used: she expected the air conditioners to be installed in the bedrooms; one fan was intended to cool the kitchen; the other, the living room-dining room area. The air conditioners were installed by representatives of the store from which Mrs. O'Connor had purchased them. The record is unclear as to who actually installed the fans. Mrs. O'Connor testified [3] that she thought the fan for the living room, the one involved in the instant suit, was installed by the girls' boyfriends. In any event, the fan was installed in the window of the wall separating the attached front porch from the living room inside. Mrs. O'Connor saw the fan after it was installed. The fan was subsequently removed, presumably for the winter months, and reinstalled the following summer of 1966.

At the time of the accident, the fan was installed in the center window frame in the wall between the porch and the living room. The fan had expandable sides which fitted against the frame of the window, the bottom of the fan rested on the casement, and the window sash pulled down on top of the fan to hold it in place. Although the fan was designed for use in a window, it did not have any built-in grill or other protection to cover the blades on the exterior side. The fan was installed in such a manner that the exterior side faced on the front porch approximately four feet off the porch floor. Appellee testified that she expected an aluminum window screen to fit into the window on the outside of the fan. This window screen was a light weight half-screen which fitted on tracks on the side and was easily removable.[4] On the day of the accident the screen was not in place. Defendant testified that her maintenance man, Mr. Wollridge, may have been the person who reinstalled the fan in the window in the summer of 1966, the year after it was first purchased, and the summer in which the accident occurred.

By August 1966 the English girls were long departed and Mrs. O'Connor had leased the premises to a group of five American girls for a one year term beginning September, 1965. These tenants were described as "all working girls. * * * around [the ages of] 24 and 25." Although each of the girls originally signed the lease, Mrs. O'Connor testified that the tenancy arrangements were quite flexible, and that "when a girl married or transferred, she would find a replacement. The replacement had also to sign the lease for the rest of the tenancy. * * * Sometimes a girl would leave and pay her rent for the current month and then they would give the girls in the house an opportunity to use some selection in a choice of a tenant."

Appellee O'Connor also testified that she considered herself responsible for all of the regular maintenance at the Woodley Place premises and that she had a regular electrician, a regular plumber, and a regular maintenance man whom she engaged to effect such maintenance. The tenants were instructed to call these repairmen directly if any maintenance problems arose, and appellee then paid the bills for whatever services were rendered.

On 10 August 1966 the seven year old plaintiff, John J. Clarke, Jr., and two other neighborhood children had entered the premises at the invitation of Gail Davis, one of the group of girls occupying the house, for some cookies to complement the ice cream the children had just purchased. While on the front porch of the house, John peered or called through the fan to one of his young friends inside in the living room, and in the process his face came in contact with

3. Appellee O'Connor was called as a witness by appellant.

4. Appellee testified "you lift [the screen] up and [it] just came out." Her counsel told the jury the screen weighed "not even half a pound" and could be removed "by a child or anyone."

the whirling blades, causing severe and permanent injuries. John's mother testified that immediately after the accident Gail Davis rushed into the Clarke home a few doors away and tearfully stated, "Oh, I am sorry. What happened, [sic] I told my landlord, my cat almost got his tail caught in the fan."

## II. *The Landlord's Duty—Existence and Three Sources*

At trial appellant relied on both the common law and the District of Columbia Housing Code[5] as establishing the landlord's duty to use reasonable care to maintain the premises in a safe condition. The trial court, however, held that the D.C. Housing Code could not be relied upon as establishing a duty in these particular circumstances and that the ambit of appellee's common law duty was limited to the question of whether the appellee retained sufficient control over the premises to obligate her to take steps to ensure that the window screen was in place in front of the fan at all times. Finding that, inasmuch as the tenants were in possession and control of the entire house, including the window screen and fan, it would be an unreasonable burden to require the landlord constantly to check to see that the screen had not been removed, the District Court ruled that as a matter of law no duty rested upon appellee with respect to the fan.

We think that under the circumstances here such a narrow view of the scope of a landlord's duty is unwarranted. Rather, we find that on the facts of this case, there are at least three bases for establishing that the landlord had a duty to use reasonable care with respect to providing, installing, and maintaining the fan. We do not here find that the landlord breached such a duty; that question is for the jury. We merely hold that the jury should have been permitted to decide the issue of the landlord's asserted negligence.

### A. *Duty to Provide Originally Safe Equipment*

In the first place, it is apparent that aside from the somewhat unusual nature of the tenancy here involved, the appellee, when she supplied the fan, had a duty to provide a piece of equipment that was reasonably safe for its intended use.[6] Having purchased a fan that had no protective device covering the blades on the side intended to face the exterior of the window, the appellee proceeded to direct its installation in a window located between two habitable areas of the same building. Furthermore, on the record here, the jury could have concluded that in the year in question, 1966, appellee's agent actually installed the fan in its location at the

5. House Regulations of the District of Columbia (1956). Chapter 2 of the regulations, titled the "Housing Code of the District of Columbia," establishes "minimum standards of repair, sanitation and occupancy." Whetzel v. Jess Fisher Management Co., 108 U.S.App.D.C. 385, 390, 282 F.2d 943, 948 (1960).

6. Beard v. General Real Estate Corp., 229 F.2d 260 (10th Cir. 1956); Bailey v. Zlotnick, 80 U.S.App.D.C. 117, 149 F.2d 505 (1945); Gayle v. Hazelwood, 196 Va. 674, 85 S.E.2d 243 (1955). *See* Annot., 84 A.L.R.2d 1190, 1194, where the rule is stated thusly:

Although a landlord ordinarily is not liable either to the tenant or his guests or invitees for the safe condition of the leased premises the possession of which he surrendered to the lessee, it is well established that if he undertakes to repair or improve the demised premises, whether he is under an obligation imposed on his part to repair or improve or not, he is required to exercise reasonable care in making such repairs or improvements, and is liable for injuries caused by his negligence or unskillfulness or that of his servants * * * in making them or in leaving the premises in an unsafe condition. *See also,* Restatement (Second) of Torts § 362 (1965); Annot., 25 A.L.R.2d 576 (1952); W. Prosser, Torts 424 (3rd ed. 1964); *cf.* Gladden v. Walker & Dunlop, Inc., 83 U.S.App.D.C. 224, 168 F.2d 321 (1948); Green v. Kahn, 391 S.W.2d 269 (Mo.1965); Primus v. Bellevue Apartments, 241 Iowa 1055, 44 N.W.2d 347 (1950).

time of the accident.[7] The question thus becomes whether the precautions taken, namely, the installation of a lightweight, easily removable window screen in front of the exposed fan blades amounted to reasonable care under the circumstances. This question should have been submitted to the jury.

### B. Duty of Maintenance in a Safe Condition Under the Housing Code

■■ Appellee argues that under the law of this jurisdiction, "absent a duty created by contract or statute, a landlord is not responsible for injuries resulting from a defect which develops during the term of a lease. * * * "[8] Such was the rule laid down by this court in Bowles v. Mahoney.[9] As we have recently noted, however, Bowles has been "effectively overruled, on the basis of the enactment of the housing code,"[10] by Whetzel v. Jess Fisher Management Co.,[11] and Kanelos v. Kettler.[12]

■ This brings us to the applicability of the Housing Code as establishing a duty on the landlord in the circumstances here. The trial judge held that the Code imposed no duty on appellee with respect to the condition of the fan: First, because the Code sections pertaining to the maintenance of mechanical ventilating equipment were not intended to apply to such an item as a movable window fan;[13] and, second, because the section of the Code placing a duty on the landlord to provide window screens for leased premises does not require the landlord to ensure that the screens are in place at all times, in view of the fact that the tenant's presence on the property places him in a better position to perform this function.[14] We find it unnecessary to pass on the correctness of

---

7. Appellee testified that when she purchased the fan in the summer of 1965, she had it delivered to the premises. She thought that the fan was then installed by the boy friends of the English girl tenants. She further testified that "I did not to my recollection, arrange for installation [in 1965]. I can't remember." Subsequently she testified that her maintenance man, Bill Wollridge, "may have installed [the fan] in 1965." It is evident, however, from the context of the questions and answers surrounding this testimony that the appellee did not intend to contradict herself by this latter testimony, and that she was actually referring to the summer of 1966 as the time when Wollridge "may" have installed the fan. The jury would have been justified in inferring that this was the import of her testimony from the context of the examination. Additionally, in response to a later question on re-direct examination, she testified that the fan was reinstalled again in 1967 and the screen was put in front of it by "Mr. Wollridge, I imagine."

8. Even granting the validity of this statement, its helpfulness to the appellee depends upon the acceptance of appellee's view that the defect involved was the absence of the screen at the time of the accident. If, however, the defect was the type of fan used, its positioning, and the inadequacy, ab initio, of the window screen as a proper safety device, then the

defect indeed existed at the beginning of the lease, was abated for the winter months, and reinstated the following summer when the accident took place.

9. 91 U.S.App.D.C. 155, 159, 202 F.2d 320, 323 (1952).

10. Javins v. First National Realty Corp., 139 U.S.App.D.C. 369, at 378, n. 52, 428 F.2d 1071, at 1080 (1970).

11. 108 U.S.App.D.C. 385, 282 F.2d 943 (1960). Whetzel decided inter alia, that § 2304 of the Code, which provides

   Rental Units: No person shall rent or offer to rent any habitation, or the furnishings thereof, unless such habitation and its furnishings are in a clean, safe and sanitary condition, in repair, and free from rodents or vermin.

   "at the very least * * * imposes an obligation upon the landlord to put the premises in safe condition prior to their rental." Id. 282 F.2d at 949. Appellant specifically cited and relied on Whetzel and § 2304 in the trial court. However, Whetzel also determined that § 2501 of the Code placed an obligation on both the landlord and the tenant. Id. at 950. For the significance of § 2501 to appellant's case see note 15, infra.

12. 132 U.S.App.D.C. 133, 406 F.2d 951 (1968).

13. Housing Code, §§ 2401, 2408.

14. Id., § 2608.

these specific determinations, however, because we are of the view that another section of the Housing Code imposed a duty on appellee which was sufficient to require submission of the case to the jury. Section 2501 of the Housing Code provides:

> *General Maintenance and Repair:* Every building housing one or more habitations shall be maintained and kept in repair so as to provide decent living accommodations for the occupants. This part of this Code contemplates more than mere basic repairs and maintenance to keep out the elements; its purpose is to include repairs and maintenance designed to make a building or neighborhood healthy and safe.

■ As we stated in Kanelos v. Kettler, *supra,* this section " 'impose[s] obligations which are extended to both the landlord and the tenant' * * * and tax[es] appellee with 'duty of care toward [his] tenants.' " [15] And even more recently, in Javins v. First National Realty Corp.[16] referring to § 2501, we said:

> By its terms, this section applies to maintenance and repair during the lease term * * *. We think it untenable to find that this section has no effect * * * after * * * [the lease] has been signed. To the contrary, by signing the lease the landlord has undertaken a continuing obligation to the tenant to maintain the premises in accordance with all applicable law.[17]

■ As *Kanelos* indicates, section 2501 imposes a duty jointly on landlords and tenants. The fact that in the instant case the tenants may themselves have breached their duty under this section is no ground for relieving the landlord from responsibility to third parties, if in fact the landlord failed to exercise reasonable care as well.[18] For the purposes of tort liability section 2501's intent "to include repairs and maintenance designed to make a premises or neighborhood healthy and safe"

15. 132 U.S.App.D.C. at 136, 406 F.2d at 954 (quoting from *Whetzel, supra*).

Appellee argues strenuously that because appellant never specifically referred to § 2501 at trial, he is precluded from urging the applicability of this section on appeal. Examination of the record, however, reveals that during the argument on the motion for a directed verdict appellant's counsel specifically cited our then week-old decision in Kanelos v. Kettler, *supra* note 12, and explicitly and accurately argued to the court that *Kanelos* held that the Housing Code imposed a continuing duty on both the landlord and the tenant to maintain the premises in a safe condition during the term of the lease. *Kanelos* dealt specifically with § 2501 and the responsibilities of landlord and tenant thereunder during the lease term. We are therefore of the opinion that the trial judge was adequately informed of the relevant law, so as to permit appellant to rely on § 2501 in this appeal from the judgment entered pursuant to the granting of the directed verdict.

In this connection we note that, as stated by this court in *Javins,* note 10 *supra,* "[w]hen the public policy has been enacted into law like the housing code, that policy will usually have deep roots in the expectations and intentions of most people." (139 U.S.App.D.C. at 379, n. 56, 428 F.2d at 1081). With this consideration in mind, we are not disposed to be overly technical as to the manner in which the applicability of the Housing Code is raised. Appellee knew in advance of trial that appellant intended to rely in part on the Housing Code, and we do not consider that the failure to refer specifically to a section of such general applicability as § 2501 could reasonably have resulted in appellee being unaware of its potential applicability.

16. 139 U.S.App.D.C. 369, 428 F.2d 1071 (May 7, 1970).

17. *Id.* 139 U.S.App.D.C. at 379, 428 F.2d at 1081. *See also* Brown v. Southall Realty Co., 237 A.2d 834 (D.C.App.1968).

18. Of course, if a tenant himself had been injured and brought suit against the landlord for breach of the duty established by § 2501, the tenant's case would be subject to the defense that he had also violated his duty under § 2501, breach of which would be "at least evidence of contributory negligence." *See* Whetzel v. Jess Fisher Managment Co., 108 U.S. App.D.C. 385, 392, 282 F.2d 943, 950 (1960).

must be read as imposing a duty on those affected to use reasonable care to provide such repairs and maintenance. The standard of care thus established is the same as in a common law negligence action, *i.e.*, reasonable care under the circumstances.[19]

In the instant case there was evidence from which the jury could have found that the window screen was inadequate from the beginning to serve as a protective device or that, as appellee knew, it had been removed or was easily capable of being removed. We think the jury should have been permitted to decide whether appellee had sufficient notice, either from the beginning or at such time as the inadequacy or removal of the window screen should have been observed, of the alleged deficiency in the protection of persons from moving fan blades,[20] and, if so, whether the appellee's failure to take steps to provide protection of a more permanent nature was unreasonable under the circumstances.

### C. *Duty of Maintenance in a Safe Condition Under Common Law*

Finally, we turn to the question of appellee's duty to maintain the premises under common law, apart from the requirements of the Housing Code and apart from any duty to use reasonable care to supply a safe appliance initially. Although on the facts presented this is an admittedly close question, we have concluded that as a matter of common law, the duty is placed on the appellee here because of the unusual circumstances surrounding the tenancy involved. We recognize, of course, that the general common law rule, both in this and in other jurisdictions, is that absent a duty assumed by contract, a landlord is liable for injuries resulting from defects on the leased premises only if he has retained a substantial degree of control over that portion of the premises where the defect occurs.[21] This rule is normally invoked to impose a duty on a landlord to use reasonable care to provide for the safety of common areas in buildings containing separate dwellings of multiple tenants.[22] We have recently recognized in another context, however, that the presently prevailing common law rule is in many respects an archaic vestige of a time when the main value of a leasehold lay in the agrarian potential of the land. In Javins v. First National Realty Corp., *supra,* this court, in holding that a tenant's liability for rent under a lease contract is contingent upon the landlord's fulfilling an implied warranty of habitability, recounted that:

> The assumption of the landlord-tenant law, derived from feudal property law, that a lease primarily conveyed to the tenant an interest in land may have been reasonable in a rural, agrarian society; it may continue to be reasonable in some leases involving farming or commercial land. In these cases, the value of the lease to the tenant is the land itself. [But] * * * [w]hen American city dwellers, both rich and poor seek "shelter" today, they seek a well known package of goods and services—a package which includes not merely walls and ceilings, but also adequate heat, light, and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance. * * * The common law rule absolving the lessor of all obligation to repair originated in the early middle ages. Such a rule was perhaps

19. *See* Kline v. 1500 Massachusetts Ave. Apartment Corp., No. 23,401 (D.C.Cir. Aug. 6, 1970).

20. *See* Harris v. H. G. Smithy Co., 139 U.S.App.D.C. 65, 429 F.2d 744 (1970).

21. *See e. g.*, Cioffi v. Queenstown Apartments, Section E, Inc., 100 U.S.App.D.C. 227, 243 F.2d 650 (1957); Gladden v. Walker & Dunlop, Inc., 83 U.S.App.D.C. 224, 225, 168 F.2d 321, 322 (1948). W. Prosser, Torts 420 (3rd ed. 1964) (citing cases); Restatement (Second) of Torts § 360 (1965).

22. *E. g.*, Kline v. 1500 Massachusetts Ave. Apartment Corp., No. 23,401 (D.C.Cir. Aug. 6, 1970); Harris v. H. G. Smithy Co., 139 U.S.App.D.C. 65, 429 F.2d 744 (1970).

well suited to an agrarian economy; the land was more important than whatever small living structure was included in the leasehold, and the tenant farmer was fully capable of making repairs himself. These historical facts were the basis on which the common law constructed its rule; they also provided the necessary prerequisites for its application.[23]

Our court in *Javins* thus recognized that the assumptions on which the common law no repair rule was based no longer have vitality in the urban dwelling context. For reasons similar to those we found persuasive in *Javins* in adopting a warranty of habitability theory, we think that in a tort context the rule providing that the landlord is subject to a duty to repair only insofar as he retains "control" of the property should not apply to the type of rental arrangement demonstrated by the instant case.

As *Javins* found to be the case for the modern apartment dweller, each tenant here "more closely resemble[d] the guest in an inn than [she] resembled an agrarian tenant."[24] Here, appellee leased her premises to a fluctuating group of young girls, requiring each to sign the lease, yet expressly contemplating that the composition of the tenant group would change sporadically.[25] Rather than leasing the house to one individual or family, appellee, in effect, leased to a group of strangers contemplated by themselves and by the appellee to use the premises as "roommates", each without formal ties or responsibilities to the others. Additionally, appellee held herself out as assuming responsibility for regular maintenance of the house, instructing the tenants to call designated repairmen at appellee's expense. In these circumstances it is not surprising that no one of the girls assumed the responsibility for seeing that the screen remained in place, but rather relied on appellee to use reasonable care to maintain the premises for them.[26]

Because of the type of tenancy arrangement she chose for her premises, and because of the reliance which she induced in her tenants by her maintenance arrangements, appellee should not now be heard to say that she was under no duty to provide for the safety of the premises, at least with respect to injuries to third parties.[27] In effect the entire house, with the possible exceptions of the bedrooms, was an area reserved by the landlord for the common use of separate

---

23. 139 U.S.App.D.C. at 372–375, 428 F.2d at 1074, 1077 (1970).

24. *Id.* 139 U.S.App.D.C. at 375, n. 33, 428 F.2d at 1077 *quoting from* Model Residential Landlord—Tenant Code 6–7 (Tent. Draft 1969). As we noted in *Javins*, Even the old common law courts responded with a different rule for a landlord-tenant relationship which did not not conform to the model of the usual agrarian lease. Much more substantial obligations were placed upon the keepers of inns (the only multiple dwelling houses known to the common law). Their guests were interested solely in shelter and could not be expected to make their own repairs. *Id.*

25. Indeed, the facts of this case approach the court developed "exception to the no-repair rule for short term leases of furnished dwellings" which we took note of in *Javins*. *See Id.* 139 U.S.App.D.C. at 376, 428 F.2d at 1078 and authorities there cited. The premises involved here were fully furnished and the lease arrangement comptemplated that the individual tenants, by securing a replacement, could stay for whatever length of time they pleased within the one year period.

26. *Cf.*, Restatement (Second) of Torts § 357 (1965) and comment thereto, noting the peculiar likelihood that the lessee will rely upon the lessor to make the repairs, and so will be induced to forego efforts which he would otherwise make to remedy conditions dangerous to himself and to others who enter the land with his consent. We think this consideration has relevance to the special fact situation here, as well as to the situation covered by § 357.

27. In his opening statement to the jury, counsel for appellee himself stressed the "unique" character of appellee's maintenance arrangements.

tenants.[28] That these tenants may have been negligent themselves in failing to take proper precautions and in relying on the landlord to assure the safe condition of the window fan should not, in these circumstances, exculpate appellee from all responsibility. Rather, the jury should have been allowed to decide whether, in light of all the facts, including those which the appellee might have presented, a failure to use reasonable care existed.

Reversed and remanded for a new trial.

28. *Cf.*, Annot. 25 A.L.R.2d 576 (1952); W. Prosser, Torts 420 (3rd ed. 1964).