**UNITED STATES of America**

**v.**

**Daniel M. EICHBERG, Appellant.**

**Nos. 22829, 22830.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 27, 1970.

Decided Jan. 21, 1971.

Bazelon, Chief Judge, concurred and filed opinion.

Mr. Lawrence E. Freedman, Alexandria, Va. (appointed by this Court) for appellant.

Mr. Edwin K. Hall, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee. Messrs. David G. Bress, U. S. Atty. at the time the record was filed, and Roger E. Zuckerman, Asst. U. S. Atty., also entered appearances for appellee.

Before BAZELON, Chief Judge, and WRIGHT and McGOWAN, Circuit Judges.

**PER CURIAM:**

This is an appeal from a criminal conviction, in which the principal defense was insanity. Appellant contends that the trial judge should have granted his motion of acquittal, because the government failed to prove responsibility beyond a reasonable doubt.[1]

There may be a defendant so clearly and so seriously disabled that a jury would be compelled to doubt his responsibility, and this court would reverse a conviction on that ground.[2] But ordinarily, "in view of the complicated nature of the decision to be made—intertwining moral, legal, and medical judgments"[3] the jury's verdict must stand. The expert evidence in this case presented a classic question for the jury on the issue of responsibility. Accordingly, the conviction must be

Affirmed.

**BAZELON, Chief Judge (concurring):**

I agree that under any test of insanity the evidence presented a jury question on that issue and not a case for a directed verdict of acquittal. I am troubled, however, by the weakness of the government's evidence, in view of the fact that the government has the burden of proving criminal responsibility beyond a reasonable doubt. I have resolved my doubts on that score by reexamining the function of the jury in evaluating evidence on the issue of responsibility. That analysis is set forth in this opinion, together with a suggested change in the jury instructions, which seems to be required by my analysis. Finally, I have outlined some related problems in this area, and suggested ways in which the instructions might be modified to deal with them.

I

In 1961 appellant, a registered pharmacist, was convicted for the first time of forging checks. After serving his sentence, he entered a course of psychiatric treatment with one Dr. Milton Layden.[1] While he was in treatment he committed the acts involved in this case.[2] Thus this is an unusual insanity case: expert testimony is available from a psychiatrist who examined the defendant at the time of the acts charged.

Dr. Layden testified that in 1965 appellant suffered greatly from inferiority feelings, for which he compensated by lying, bragging, and otherwise assuming a pose of superiority. According to Dr. Layden, appellant felt especially threatened by the fact that his wife had a steady income as a registered nurse,

---

1. Appellant also contends that he was deprived of his right to counsel at the psychiatric staff conference held to inquire into the question of criminal responsibility. See Thornton v. Corcoran, 132 U.S.App.D.C. 232, 407 F.2d 695 (1969). The point was neither raised below nor pressed at argument on appeal. Moreover, both the staff conference and the trial occurred before our decision in *Thornton.* Finally, the record does not indicate that appellant was prejudiced in his cross-examination of the government's expert witness. We prefer to await more appropriate circumstances for considering the difficult questions involved in a properly presented claim of that type.

2. *E. g.,* Frigillana v. United Stiaes, 113 U.S.App.D.C. 328, 307 F.2d 665 (1962); Isaac v. United States, 109 U.S.App.D.C. 34, 284 F.2d 168 (1960); *see* King v. United States, 125 U.S.App.D.C. 318, 324, 372 F.2d 383, 389 (1967).

3. Adams v. United States, 134 U.S.App. D.C. 137, 142, 413 F.2d 411, 416 (1969), *quoting* King v. United States, 125 U.S. App.D.C. at 324, 372 F.2d at 389; *accord,* Parman v. United States, 130 U. S.App.D.C. 188, 196–197, 399 F.2d 559, 567–568 (1968).

1. Dr. Layden testified that appellant came to him at least partly because he had been told to seek psychiatric treatment if he wanted to be reinstated as a pharmacist in Maryland. Tr. 272.

2. Appellant was convicted of forging and uttering bank checks, and transporting forged securities in interstate commerce. D.C.Code § 22–1401 (1967); 18 U.S.C. § 2314 (1964). He received concurrent sentences of three to ten years on each of six counts.

while his own income was erratic because of his difficulties in finding a job. Forging checks, according to the doctor, would have been a natural expression of appellant's anxiety; he would pretend to himself, as well as to others, that he was a rich man with a large bank account.

After some preliminary skirmishing, appellant was committed to St. Elizabeths Hospital for examination in March of 1968.[3] The psychiatrists in that hospital are regularly asked to assess the past mental condition of a patient, and ordinarily they show no reluctance to do so.[4] In this case, however, the official report to the court stated that there was no indication of present illness, and refused to comment on appellant's condition in 1965. The only Hospital psychiatrist to testify stated that in 1968 he found no indication of illness, but that the best source of information about appellant's condition in 1965 was the doctor who was treating him at that time. The government also presented the testimony of a clinical psychologist who had tested appellant in 1967.[5] The psychologist stated that appellant had over-whelming needs for status and financial gain, and that he would be likely to act impulsively in a financial crisis, but that he was not suffering from a mental illness.

The record thus establishes that some sort of disturbance existed in 1965, although its gravity and nature are uncertain. In these circumstances, it might well seem that the government's evidence was too flimsy to sustain the burden of proving beyond a reasonable doubt that appellant was free of exculpatory mental illness. We have held, however, that almost any conflict in the expert testimony raises a question for the jury;[6] and that in some cases the government can carry its burden merely by relying on the patent weakness of the evidence presented by the defendant.[7] In recent years we have been increasingly reluctant to disturb the jury's resolution of the question of responsibility.[8] These developments compel me to consider whether our practice is consistent with the rule that the government must prove criminal responsibility beyond a reasonable doubt.[9] For if the govern-

3. The principal cause of the delay appears to have been a letter filed by appellant's counsel, alleging that appellant had been seriously injured in an automobile accident, and requesting postponement of court action. This letter, and a later letter also filed, purported to be from a physician, but ultimately proved to be forgeries. Tr. 178. Eight months after the first letter was filed, appellant changed his plea to guilty. Six months after that, a new lawyer entered an appearance and filed a successful motion to withdraw the guilty plea after sentence, in order to present an insanity defense. At that time appellant was committed to St. Elizabeths Hospital for examination.

4. A member of this court once coined the term "antegnosis" to describe the process of diagnosing a past mental condition, a process of which he was quite dubious. Wright v. United States, 102 U.S.App. D.C. 36, 47, 250 F.2d 4, 15 (1957) (Miller, J., dissenting).

5. The tests were performed for sentencing purposes, before appellant withdrew his guilty plea. 18 U.S.C. § 4208(b) (1964).

6. *E.g.*, Horton v. United States, 115 U.S. App.D.C. 184, 317 F.2d 595 (1963); Strickland v. United States, 115 U.S.App. D.C. 5, 316 F.2d 656 (1963).

7. King v. United States, 125 U.S.App.D.C. 318, 372 F.2d 383 (1967); Hawkins v. United States, 114 U.S.App.D.C. 44, 310 F.2d 849 (1962).

8. *See, e. g.*, Adams v. United States, 134 U.S.App.D.C. 137, 413 F.2d 411 (1969); Parman v. United States, 130 U.S.App. D.C. 188, 196–197, 399 F.2d 559, 567–568 (1968); King v. United States, 125 U.S.App.D.C. 318, 372 F.2d 383 (1967).

9. The federal rule since 1895 has been that once a criminal defendant has raised the issue by introducing "some evidence" of insanity, the burden is on the government to prove responsibility beyond a reasonable doubt. Davis v. United States, 160 U.S. 469, 484, 16 S.Ct. 353, 40 L.Ed. 499 (1895); Adams v. United States, 134 U.S.App.D.C. at 141, 413 F.2d at 415; McDonald v. United States, 114 U.S.App. D.C. 120, 122, 312 F.2d 847, 849 (1962) (*en banc*); Tatum v. United States, 88

ment need produce no evidence, and if appellate courts are powerless to check the jury, then what does it mean to say that the government is held to a high standard of proof?

## II

When this court first formulated its present test of criminal responsibility, an effort was made to treat responsibility like any other element of crime requiring proof by means of expert testimony. In Durham v. United States we held that a defendant was responsible if his act was not the "product of mental disease or mental defect." [10] The role of the psychiatric expert was to testify about mental illness, and the role of the factfinder was to resolve conflicts in the testimony. If several psychiatrists stated without contradiction that the defendant was mentally ill and that his act was the product of his illness, a conviction was vulnerable to attack on the ground that the evidence was insufficient to establish responsibility beyond a reasonable doubt.

A number of convictions were reversed on that ground,[11] but the court was reluctant to overturn a jury's finding of responsibility in reliance on the weight of expert psychiatric testimony. At the root of this reluctance was the realization that there is more to a determination of responsibility than psychiatric conclusions, unanimous or not. The gravity of an impairment and its relevance to the acts charged are both questions of degree, which can only be resolved with reference to the community's sense of when it is just to hold a man responsible for his act.

Neither expert witnesses nor appellate courts reflect community values in the way that a jury does. Therefore, the court attempted to limit the interference by both experts and courts with the jury's determination of responsibility. "Mental disease" became a judicial term of art, whose presence or absence cannot be conclusively established by expert testimony alone.[12] Expert witnesses had long been urged to avoid testifying in conclusory terms;[13] they were eventually prohibited from testifying in terms of "productivity," because that kind of testimony seemed particularly likely to involve matters properly left for the jury.[14] And this court began regularly to defer to the jury's unique capacity for dealing with the question of responsibility. As we all agree:

> There may be a defendant so clearly and so seriously disabled that a jury would be compelled to doubt his responsibility, and this court would reverse a conviction on that ground. But ordinarily, 'in view of the complicated nature of the decision to be made—intertwining moral, legal, and medical judgments' the jury's verdict must stand.[15]

One way to explain this approach would be to say frankly that it repre-

U.S.App.D.C. 386, 389–391, 190 F.2d 612, 615–617 (1951). *But see* Pub.L. 91–358, § 207(6) (July 29, 1970) (defendant in District of Columbia must establish insanity by preponderance of evidence), discussed at note 17 *infra*.

10. 94 U.S.App.D.C. 228, 240–241, 214 F.2d 862, 874–875 (1954).

11. Frigillana v. United States, 113 U.S. App.D.C. 328, 307 F.2d 665 (1962); Isaac v. United States, 109 U.S.App.D.C. 34, 284 F.2d 168 (1960); Hopkins v. United States, 107 U.S.App.D.C. 126, 275 F.2d 155 (1959); Satterwhite v. United States, 105 U.S.App.D.C. 398, 267 F.2d 675 (1959); Fielding v. United States, 102 U.S.App.D.C. 167, 251 F.2d 878

(1957); Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4 (1957) (*en banc*); Douglas v. United States, 99 U.S. App.D.C. 232, 239 F.2d 52 (1956).

12. McDonald v. United States, 114 U.S. App.D.C. at 132–133, 312 F.2d at 850–851.

13. *E. g.*, Campbell v. United States, 113 U.S.App.D.C. 260, 307 F.2d 597 (1962); Stewart v. United States, 101 U.S.App. D.C. 51, 247 F.2d 42 (1957); Stewart v. United States, 94 U.S.App.D.C. 293, 214 F.2d 879 (1955).

14. Washington v. United States, 129 U.S. App.D.C. 29, 390 F.2d 444 (1967).

15. P. 621 *supra* (footnotes omitted).

sents a retreat from the rule that the government must prove every element of a crime beyond a reasonable doubt. In Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), a sharply divided Supreme Court held that the Constitution does not require the government to prove criminal responsibility beyond a reasonable doubt. Although the Court had earlier held that, in the federal courts at least, the government must prove responsibility beyond a reasonable doubt,[16] it might nevertheless be argued that this court has modified the rule to permit a finding of responsibility on the basis of a lesser quantum of proof.

This court has never admitted, however, that it was relaxing the standard of proof on the issue of responsibility.[17] Furthermore, it is no longer clear that a lesser standard of proof would be constitutionally permissible. For the continuing vitality of *Leland* is open to serious question in light of In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In *Winship*, the Court made it clear that the Constitution is the source of the rule that the government must prove every element of a crime beyond a reasonable doubt. 397 U.S. at 364, 90 S.Ct. at 1073. And when the defendant's criminal responsibility is at issue, it would seem to be an element of the offense, subject to the *Winship* rule.

An alternative explanation for our unusual deference to the jury on the issue of responsibility is to say that, for that issue alone, we have adopted the Second Circuit's approach to the rule of reasonable doubt. In the Second Circuit, a jury in a criminal case is instructed that the government must prove every element of the crime beyond a reasonable doubt. But the reviewing court tests the sufficiency of the evidence without regard to that requirement, holding only that the verdict must be supported by substantial evidence, as in a civil case.[18] In light of *Winship*, the constitutionality of the Second Circuit approach is doubtful, since it leaves the reviewing court powerless to enforce the rule embodied in the jury instruction.[19] To recite the rule of reasonable doubt without enforcing it "reduces the criminal standard to little more than a verbal ritual, a ceremonial set of words included in the judge's charge." [20]

The only acceptable explanation of our deference to the jury on the issue of responsibility lies in the special nature of the jury's role in resolving that issue. With respect to responsibility the jury has two functions. In the first place it measures the extent to which the defendant's mental and emotional processes and behavior controls were impaired at the time of the unlawful act. The answer to that question is elusive, but no more so than many other facts that a jury must find beyond a reasonable doubt in a criminal trial.[21] The determination must be based on the evidence presented, and any doubts must be resolved in favor of finding greater

16. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895).

17. Compare the recent attempt of Congress to do exactly that. Pub.L. 91–358, § 207 (6) (July 29, 1970) (defendant in District of Columbia must establish insanity by preponderance of evidence).

18. United States v. Gonzales Castro, 228 F.2d 807, 808 (2d Cir.), cert. denied, 351 U.S. 940, 76 S.Ct. 838, 100 L.Ed. 1477 (1956).

19. *See* G. Abrams & L. Schwartz, Comment on Proof and Presumptions, Working Papers of the Nat'l Comm'n on Reform of Fed. Crim. Laws, vol. I, at 12 (1970).

20. United States v. Masiello, 235 F.2d 279, 288 (2d Cir.) (concurring opinion of Frank, J.), cert. denied, Stickel v. United States, 352 U.S. 882, 77 S.Ct. 100, 1 L.Ed. 2d 79 (1956).

21. The closest in character to the question of responsibility, of course, is the question of intent that differentiates the several degrees of homicide. Indeed the similarity of the inquiry into intent and the inquiry into responsibility has created substantial problems in the administration of a California statute calling for separate trials on the issues of factual "guilt" and criminal responsibility. *See* Louisell & Hazard, Insanity as a Defense: The Bifurcated Trial, 49 Cal.L.Rev. 805 (1961).

rather than lesser impairment.[22] The second function is to evaluate that impairment in light of community standards of blameworthiness, to determine whether the defendant's impairment makes it unjust to hold him responsible.[23] The jury's unique qualification for making that determination justifies our unusual deference to the jury's resolution of the issue of responsibility.

### III

I am troubled, however, by the fact that we regularly defer to the jury's unique capacity to resolve the "moral, legal, and medical" questions intertwined in the issue of responsibility, and yet we do not make the special function of the jury explicit in the instructions.

We have long recognized that the jury must not only find the objective facts of the defendant's condition, but also determine the point on the scale of human infirmities at which impaired capacity amounts to exculpatory illness. In this context, the concept of "illness" is an artificial one, similar to the concepts of "duty" and "proximate cause" in the law of torts. In deciding whether a defendant in a negligence case owed a duty of care to the plaintiff, the real question to be answered is whether by prevailing community standards the defendant was at fault, and whether the law should hold him responsible for the consequences of his conduct.[24] Similarly, in deciding whether a criminal defendant was suffering from a "mental illness" at the time of his act, the real question is whether the law should hold him responsible for the consequences of his conduct.

It seems to me that we need to find some way to explain to the jury this aspect of their task in resolving the question of responsibility. The jury is presently told that an exculpatory mental illness is a condition that impairs the defendant's mental or emotional processes and behavior controls in a manner that can be characterized as "substantial." [25] I would add to that instruction the comment that impairment is a question of degree, and that an impairment is "substantial" for the purpose of the insanity defense if the jury finds that the defendant's processes and controls were impaired to such an extent that he cannot justly be held responsible for his act.

That approach to the problem of degree was favored by a substantial majority of the British Royal Commission on Capital Punishment in 1953[26] and by a minority of the Council of the American Law Institute in 1955.[27] The ALI

22. For a discussion of the uses of expert testimony in the context of civil commitment, see United States v. McNeil, 140 U.S.App.D.C. 228, 237–241, 434 F.2d 502, 511–515 (1970) (Bazelon, C. J., concurring).

23. See, e. g., King v. United States, 125 U.S.App.D.C. at 323, 372 F.2d at 388; Holloway v. United States, 80 U.S.App. D.C. 3, 4, 148 F.2d 665, 666 (1945).

24. Clarke v. O'Connor, 140 U.S.App.D.C. 300, 302, 435 F.2d 104, 106 (1970); W. Prosser, Torts § 36 (3d ed. 1964).

25. McDonald v. United States, 114 U.S. App.D.C. at 133, 312 F.2d at 851.

26. The Commission proposed that the old M'Naghten test of insanity be replaced by the following test:
[A person is not responsible for his unlawful act if] at the time of the act the accused was suffering from disease of the mind (or mental deficiency) *to such a degree that he ought not to be held responsible.*
Royal Comm'n on Capital Punishment 1949–1953, Report § 333(iii) (1953) (emphasis added).

27. The minority, together with the Reporter for the Model Penal Code (Professor Herbert Wechsler), proposed the following test of insanity:
A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect his capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law is *so substantially impaired that he cannot justly be held responsible.*
This proposal appears as alternative (a) to paragraph (1) of Model Penal Code § 4.01 (Tent.Draft No.4, 1955) (emphasis added).

ultimately rejected it, because "[s]ome members of the Council deemed it unwise to present questions of justice to the jury, preferring a submission that *in form, at least,* confines the inquiry to fact."[28] It seems to me, however, that if our whole approach to judicial review of the jury's determination depends on the theory that the jurors are measuring mental disability in terms of community concepts of blameworthiness, then we have an obligation to tell them that is what they are expected to do.

## IV

If the jury is to perform its function in accordance with the scheme outlined above, then we must be sure that the witnesses present information about the defendant's mental and emotional processes and behavior controls, and not conclusory testimony in the form of psychiatric labels. The court *en banc* will shortly be reconsidering our test of criminal responsibility, and the associated jury instruction.[29] Accordingly, I merely raise, without attempting to resolve, two particularly troublesome issues in this regard.

A. Too often a defendant's responsibility seems to turn on whether or not the experts have given his condition a name and the status of an "illness."[30] It seems to me that the label "mental illness" impedes understanding rather than advancing it. There is no reason to tie the legal concept of responsibility to the medical model of mental illness, especially when the validity of that medical model is seriously questioned by some eminent psychiatrists.[31]

Under McDonald v. United States, any abnormal condition that impairs mental or emotional processes and behavior controls may deprive an individual of the freedom of choice that we regard as a prerequisite to imposing criminal responsibility.[32] The source of that impairment may be physiological, emotional, social, or cultural. In order to be sure that the jury does not defer to the expert's decision on the matter of men-

28. Model Penal Code § 4.01, Comment at 159 (Tent.Draft No.4, 1955) (emphasis added). *See* ALI Proceedings 206–220 (May 21, 1955) (unpublished).

29. *United States* v. *Brawner* (No. 22,714, to be reargued en banc Apr. 12, 1971).

30. As a result of the sudden decision of St. Elizabeths Hospital in 1957 to treat "sociopathic personality disturbance" as a mental illness, this court has been very sensitive to the danger of allowing psychiatric labels to determine legal results. Blocker v. United States, 110 U.S.App. D.C. 41, 48, 50, 288 F.2d 853, 860–862 (1961) (Burger, J., concurring); Blocker v. United States, 107 U.S.App.D.C. 63, 274 F.2d 572 (1959). *Compare* United States v. Collins, 140 U.S.App.D.C. 392, 398, 433 F.2d 550, 556 (1970) (concurring and dissenting opinion) (changing psychiatric views of narcotic addiction); Salzman v. United States, 131 U.S.App. D.C. 393, 408 n. 43, 405 F.2d 358, 373 n. 43 (1968) (concurring opinion of Wright, J.) (alcoholism).

31. *See, e. g.,* J. Elkes, Word Fallout: or, on the Hazards of Explanation, in The Psychopathology of Adolescence 118 (1970) (presidential address, Am. Psychopathological Ass'n); R. Leifer, In the Name of Mental Health, 196–198 (1969); K. Menninger, Toward a Unitary Concept of Mental Illness, in A Psychiatrist's World 516 (1959); K. Menninger, Changing Concepts of Disease, in A Psychiatrist's World 670 (1959); M. Roth, Seeking Common Ground in Contemporary Psychiatry, 62 Proceedings of the Royal Soc'y of Medicine 765 (1969) (presidential address, section of psychiatry); M. Susser, Community Psychiatry 10–20 (1968); T. Szasz, The Myth of Mental Illness (1961).

The medical model of mental illness has been questioned ever more extensively by behavioral scientists outside psychiatry. *See, e. g.,* G. Albee, The Uncertain Future of Clinical Psychology, 25 American Psychologist 1071 (1970) (presidential address, Am. Psychological Ass'n); E. Wolf, Learning Theory and Psychoanalysis, 39 British Journal of Medical Psychology 525 (1969) (paper and critical evaluations); The Mental Patient: Studies in the Sociology of Deviance (S. Spitzer & N. Denzin ed. 1968).

32. 114 U.S.App.D.C. at 133, 312 F.2d at 851.

tal illness, it may well be appropriate to abandon the term "mental illness" altogether.[33] In that case, the jury would be instructed simply to consider all the testimony describing the defendant's mental and emotional processes and behavior controls, and determine the nature and extent of any impairment. The jury could then decide, in accordance with the discussion above, whether that impairment was sufficiently serious and sufficiently relevant to the unlawful act so that it would be unjust to hold the defendant criminally responsible.

B. Like the term "mental illness", the term "product" seems to invite experts to invade the province of the jury, and evaluate the defendant's blameworthiness. In Washington v. United States we attempted to deal with that problem by prohibiting psychiatric testimony on the issue of productivity.[34] The *Washington* rule, however, has been difficult to enforce.[35] Furthermore, it fails to reach another, related problem inherent in the product requirement. That problem arises from the definition of "productivity" as causation of the "but-for" variety: an act is the product of mental disease when "the accused would not have committed the act he did commit if he had not been diseased as

he was."[36] Accordingly, a witness or a juror might well conclude that the act in question is common in the defendant's neighborhood, and consequently the defendant probably would have committed it even if he had not been disabled in any way.[37] Jurors cannot be permitted to speculate about the defendant's character and convict him on the ground that he would have been "bad" if he had not been "sick." At best, that sort of speculation is unreliable; at worst, it has the pernicious effect of establishing a double standard of morality, treating unlawful behavior as blameworthy in slum neighborhoods where it is prevalent, and excusing it elsewhere as the product of mental illness.[38]

One solution would be simply to eliminate the question of productivity from our test of criminal responsibility. The Ninth Circuit, in a thoughtful opinion, recently examined our test and observed "the product portion of the test seems superfluous."[39] The court reasoned that once a disability has been established, it will ordinarily be impossible to prove that it had no relationship to the unlawful act.

The Ninth Circuit may well be right in characterizing our product require-

---

33. *See* Washington v. United States, 129 U.S.App.D.C. at 38 n. 23, 390 F.2d at 452 n. 23.

34. 129 U.S.App.D.C. at 40–41, 390 F.2d at 455–456.

35. No reported opinions have been found reversing a conviction on the ground that* *Washington* was violated. The reluctance of the court to enforce a rigid limitation on expert testimony has been apparent from the start. Although the *Washington* opinion expressly prohibits testimony "directly in terms of 'product,' or even 'result' or 'cause'," the sample instruction to expert witnesses appended to the opinion does not prohibit such testimony; it merely advises the expert that "it will not be necessary for you to express an opinion on whether the alleged crime was a 'product' of a mental disease or defect and you will not be asked to do so." *Id.*

at 42, 390 F.2d at 457. *See also* the concurring opinion of Judge Fahy. *Id.* at 45–46, 390 F.2d at 460–461.

36. Carter v. United States, 102 U.S.App. D.C. 227, 236, 252 F.2d 608, 617 (1957).

37. *Compare* United States v. Carter, 141 U.S.App.D.C. 46, 55, 436 F.2d 200, 209 n. 14 (1970) (concurring opinion of Bazelon, C. J.) (rejecting psychiatrist's speculation that, had appellant not suffered from anxiety, he might nevertheless have become addicted to drugs, because he lived in an environment where drug addiction was common).

38. Thus, the rich man's theft is often labelled "kleptomania," while the poor man's theft is labelled "crime."

39. Wade v. United States, 426 F.2d 64, 69 (1970) (*en banc*) (adopting the ALI test of responsibility).

ment as superfluous, though perhaps for a slightly different reason. Contrary to the expectations of courts and commentators alike,[40] psychiatrists in this jurisdiction have regularly concluded, and convinced juries, that a mentally ill defendant should be convicted because his act was not the product of his illness. But we have found that in so doing, they were invading the province of the jury, and consequently in *Washington* we prohibited expert testimony on the issue of productivity.

We assume that it is usually possible to establish some sort of causal relationship between most mental illness and most unlawful conduct. The requirement of productivity is chiefly a device that permits the jury to decide that the illness was too slight or the causal connection too remote to have legal significance. That function is also served, however, by the requirement of *McDonald* that any impairment must be "substantial" in order to serve as a basis for acquittal. Especially if the *McDonald* requirement is interpreted as I have suggested above, to incorporate a jury decision on the question whether the defendant can justly be held responsible, then it would seem that the product requirement is superfluous.

## V

This is not the case in which to resolve these questions. But it is important at least to raise them, in every case involving the insanity defense. For they go to the heart of the issue of criminal responsibility, and force us to confront the difficult task of distinguishing between the uniquely psychiatric elements of criminal responsibility and its legal and moral elements.

40. *See, e.g.,* Wechsler, The Criteria of Criminal Responsibility, 22 U.Chi.L.Rev. 367 (1955); Frigillana v. United States, 113 U.S.App.D.C. 328, 331, 307 F.2d 665,

668 (1962) (concurring opinion of Burger, J.); State v. Lucas, 30 N.J. 37, 69–71, 152 A.2d 50, 67–68 (1959).